## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  16-cv-00879-LTB-CBS

JAMES NGUYEN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO

      Defendant.

---

### PLAINTIFF'S RESPONSE TO DEFENDANT CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT

---

      Plaintiff, by and through undersigned counsel, hereby submits the following Response to Defendant City and County of Denver's Motion for Summary Judgment ("Motion"), [Doc. 37], and in support thereof states the following:

### I.    INTRODUCTION

      Denver Police Department ("DPD") fired Officer James Nguyen because he is disabled. Defendant's arguments otherwise are nothing but red herrings designed to shift the focus away from Defendant's egregious misconduct, misconduct that Defendant knew was illegal because almost twenty years ago it lost a series of court cases brought by individual DPD officers and the Department of Justice due to DPD's willful failure to provide reasonable accommodations for the known disabilities of its officers. *See Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999); *United States v. City & Cty. of Denver*, 49 F. Supp. 2d 1333 (D. Colo. 1999). Rather than learning from this history, DPD has remained steadfast in resisting the mandates of the American with

Disabilities Act, as amended ("ADA"). Officer Nguyen's experience is a perfect illustration of how far Defendant will go to escape its ADA obligations.

Officer Nguyen had a known hearing disability, for which he wore hearing aids, when he was hired as a recruit officer by DPD, after successfully working as a police officer for three years at another department. After he graduated from the DPD Academy, his training officers began to note concerns about his hearing. After letting Officer Nguyen work as a trainee officer for approximately fifteen weeks, during which issues with his hearing were extensively documented and discussed by his training officers and their supervisors, Defendant decided that Officer Nguyen's hearing disability made him a liability and began termination proceedings. When Officer Nguyen raised concerns to Human Resources that his hearing disability was the reason for his termination, Defendant initiated the "interactive process" (IAP), which is a procedure contemplated by the ADA in which an employer and employee work together to determine a reasonable accommodation.

Although the DPD's ADA policy provides that the IAP "shall" be initiated when DPD has actual or constructive notice that an officer may have a disability for which a reasonable accommodation is needed, and DPD undeniably had known since the beginning of Officer Nguyen's training that his hearing was affecting the performance of his duties, Defendant waited until after it had already decided to terminate Officer Nguyen to initiate the process. By that point, Officer Nguyen's supervisors were resolved that he was not going to be a DPD cop, no matter the results of the IAP. Thus, although Officer Nguyen's doctor recommended during the IAP that he obtain stronger hearing aids and a Bluetooth device for connecting with the police radio, Defendant refused to provide Officer Nguyen those accommodations. To effectuate this refusal, Defendant determined that, despite all medical and anecdotal evidence to the contrary,

Officer Nguyen **did not have a disability** and therefore it did not have to reasonably accommodate him, and it officially fired him the next day. Also demonstrating that the IAP was a sham and that DPD had no intention of letting Officer Nguyen return to work no matter what happened in the IAP was Officer Nguyen's supervisors' complete disregarded of an allegation of discrimination he made against one of his training officers. Indeed, they testified that because they had already decided before the IAP that Officer Nguyen was not returning to the DPD training program, there was no need to investigate his allegation of discrimination.

Defendant entirely ignores the fact that it conducted a sham IAP to make it appear like it complied with the ADA without actually complying, as well as the fact that it violated its own policy—and the ADA—by not beginning the IAP when it had notice Officer Nguyen needed an accommodation. Instead, Defendant has defended this case by arguing, on one hand, that Officer Nguyen's hearing was bad enough that it had legitimate justification to fire him, but on the other hand, his hearing was not so bad that he was disabled. Because, there thus exist disputed factual issues regarding whether Defendant discriminated against Officer Nguyen on the basis of his disability, either by failing to reasonably accommodate him (including not participating in the IAP in good faith) or by terminating him because of his disability, Defendant is not entitled to summary judgment.

## II.   RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")[1]

1.      **Admit** that Officer Nguyen has had bilateral conductive hearing loss since birth, and that he worked as a police officer at Lakeside Police Department from June 2010 to April 2013. **Admit** that he worked a part-time schedule; he worked between thirty to thirty-six hours a

---

[1] Plaintiff's responses are for purposes of Defendant's Motion only.

3

week on average, although he occasionally worked a full-time schedule. **Ex. 1,** James Nguyen

Deposition at 61:14-62:3, Jan. 31, 2017. **Deny** that most of Officer Nguyen's training at

Lakeside and over half the calls he responded to involved traffic incidents. Officer Nguyen

testified that most of his calls and training at Lakeside concerned "traffic accident investigations,

medical assists, traffic enforcement, and *assist other agencies.*" *Id.* at 69:21-70:11 (emphasis

added). Records from his training at Lakeside Police Department ("LSPD") show that his

training involved these areas as well as drug offense and investigations of major incidents or

felonies. **Ex. 2,** Lakeside Police Department FTO Records, at 2.

2.      **Admit** that Officer Nguyen wore an earpiece in his left ear at LSPD, which

wirelessly connected through a FreeLinc wireless transmitter/receiver device to his police radio.

The LSPD chief purchased the FreeLinc for Officer Nguyen's use and benefit as soon as soon as

it became apparent that Officer Nguyen was struggling with hearing the radio. **Ex. 3,** Dan

Montgomery Expert Witness Report, at 8-9. According to Officer Nguyen's training officer at

LSPD, the FreeLinc device "made 'all the difference in the world' in terms of Officer Nguyen's

radio-related performance." *Id.* at 9; *see also* **Ex. 1,** Nguyen Dep. 89:24-90:2.

3.      **Admit** that the job description for DPD officers includes various hearing ability

requirements.

4.      **Admit** in part. The job description of a DPD police officer lists certain duties and

abilities that Defendant describes as "essential job functions" (although Defendant may have

taken some liberties with its description, given that "[d]etermining the fastest route to a crime

scene" does not appear in this list). **Deny** that those duties and abilities are necessarily "essential

job functions" as that term is used for purposes of determining whether an employee is a

"qualified individual with a disability" under the ADA.

5.     **Admit** that Officer Nguyen provided information regarding his hearing impairment to Defendant before it hired him.

6.     **Admit** that Officer Nguyen attended the DPD Academy from April through October 2013. **Admit** Officer Nguyen sat "[s]omewhat close to the front" during his classes at the Academy," but **deny** he had trouble hearing. Officer Nguyen testified that if someone "talked low," he would ask them to speak up, but he did not testify, nor does it necessarily follow, that he did so because he was having difficulties hearing them; someone speaking louder may have made it easier for him to hear but he still may have heard adequately otherwise. **Ex. 1**, Nguyen Dep. 109:11-110:4.

7.     **Admit** that Officer Nguyen asked one of Defendant's employees at the Academy to provide a FreeLinc device for him and that recruits did not use a radio during the Academy.

8.     **Admit** that Officer Nguyen began a four-phase field training officer ("FTO") program after he successfully graduated from the Academy, and that he did not again ask for a FreeLinc during FTO. However, as discussed below in § V.B.2.a, Defendant's obligation to provide Officer Nguyen a reasonable accommodation for his known disability attached once Defendant had notice of his need for such, and it is irrelevant that he was not yet using a radio when he asked for Defendant to provide the FreeLinc.

**Admit** that reports completed by Officer Nguyen's training officers included what DPD labels "significant weaknesses" in each phase of FTO. But Officer Nguyen disputes the implication Defendant fired him because of his so-called significant weaknesses (which, as discussed in the Statement of Additional Disputed Material Facts, many recruits had in every phase) rather than because of his hearing disability.

9.     **Admit**.

10.   **Deny**. Officer Nguyen specifically testified that the wired earpiece did not work as well or effectively as the wireless FreeLinc in helping him hear the police radio. **Ex. 1,** Nguyen Dep. 120:11-13, 121:3-122:21. Officer Nguyen testified merely that he believed he was hearing the radio adequately with the wired earpiece (although there is no evidence in the record that any Denver employee ever asked him before he was fired whether he believed the wired earpiece was sufficient to meet his needs, and the FTO reports filled out by his training officers show that it was not).

11.   **Admit**.

12.   **Admit**.

13.   **Admit** in part, as Defendant's statement is misleading without more context. Officer Nguyen testified that he asked Corporal Ford, one of his training officers during FTO, if he had any suggestions regarding how to help him with the issues caused by his hearing disability, but Corporal Ford did not have any suggestions. **Ex. 1**, Nguyen Dep. 167:10-21, 170:3-7.

14.   **Admit**.

15.   **Admit** that Corporal Ford testified that this was his intent.

16.   **Admit**.

17.   **Admit**.

18.   **Admit**.

19.   **Admit** that training officers fill out "End of Phase Reports." Otherwise, **Admit** to the extent that "Routine Forms" is listed as a significant weakness in Officer Nguyen's End of Phase Report for Phases 1, 2, and 3;  "Officer Safety" is listed as a significant weakness for Phases 1 and 4; "Orientation/Response Time to Calls" is listed as a significant weakness for

Phases 2, 3, and 4; "Report Writing" is listed as a significant weakness for Phases 2, 3, and 4; and "Radio Listens and Comprehends" is listed as a significant weaknesses for all four phases. **Def.'s Mot. Summ. J., Ex 8**, End of Phase 1 Report, at 4-7; **Def.'s Mot. Summ. J., Ex. 9**, End of Phase 2 Report, at 5-6; **Def.'s Mot. Summ. J., Ex. 10**, End of Phase 3 Report, at 3-5; **Def.'s Mot. Summ. J., Ex. 11**, End of Phase 4 Report, at 3-6. **Admit** that for the most part, Officer Nguyen agreed during his deposition testimony that his significant weaknesses for any given phase were those listed on the End of Phase Report; however, Defendant does not cite to any deposition testimony in which Officer Nguyen agreed "Officer Safety" was a significant weakness in Phase 1.

20. **Admit**.

21. **Admit** in part. Officer Nguyen testified that he told Officer Juarez that the hearing aids he was using were "the best fit for [his] ear mold" and "the best fit for him." **Ex. 1**, Nguyen Dep. 177:17-18.

22. **Admit** that according to a report on Officer Nguyen's daily performance in FTO (a "Daily Observation Report" or "DOR") by Corporal Juarez, one of his training officers, Corporal Juarez suggested that Officer Nguyen should get a second opinion on what hearing devices he should be using. **Def.'s Mot. Summ. J., Ex 12**, 12/09/13 Daily Observation Report, at 1. **Admit** that during Officer Nguyen's deposition testimony, he agreed that he "underst[ood] that to mean that [his] hearing was serious problem at [that] time." **Ex. 1**, Nguyen Dep. 179:19-23.

23. **Admit**.

24. **Admit** that Officer Nguyen saw his otologist, Dr. Feehs, on January 15, 2014, to discuss possible surgical options because Officer Nguyen believed that Corporal Juarez wanted

him to discuss that sort of a solution with his doctor (he previously had surgeries that had improved his hearing for several years). **Admit** that Dr. Feehs charted that Officer Nguyen "would look into the option of a new hearing aid first and call to schedule [a possible surgery], if desired." **Deny** that Dr. Feehs made any recommendation regarding Officer Nguyen seeing an audiologist to discuss hearing aids; Officer Nguyen specifically testified that Dr. Feehs did not tell him to schedule an appointment with an audiologist, but rather referred him to an audiologist in his practice if he wanted to discuss hearing aids. **Ex. 1,** Nguyen Dep.182:20-185:10.

25.     **Admit** that Officer Nguyen saw an audiology extern on January 15, 2014, who charted that she explained to Officer Nguyen that "a higher tech level [would] provide more benefit." **Ex. 4,** Ashley Huerta Dep. 14:1, 15:17-16:18, 19:9-14, Mar. 31, 2017. However, Officer Nguyen's audiologist, Dr. Ashley Huerta, testified that she believed the extern's recommendation was incorrect because based on the nature of Officer Nguyen's hearing loss, he did not need higher-level technology. *Id.* at 20:3-13. **Admit** that the extern charted Officer Nguyen did not want behind-the-ear ("BTE") hearing aids because he was in law enforcement. Dr. Huerta testified that Officer Nguyen was concerned about how more visible hearing aids like BTEs would affect people's impression of him on the job. *Id.* at 19:16-20:20, 60:18-61:1.

26.     **Admit** in part. Officer Nguyen testified that he explained to Corporal Day, another of his FTO training officers, that "surgery was a risk for [him] so [he] didn't think [he] wanted to go through with that." **Ex. 1,** Nguyen Dep. 189:12-16. Officer Nguyen testified that he felt he "needed to . . . research hearing aids to see which one [was] better for [him]" so "[he] wasn't going to make any modifications at that time because [he] didn't know which one [he] prefer[ed]." *Id.* at 189:18-24.

27.     **Admit** in part and **deny** in part as follows:

a. **Admit** that in his End of Phase 1 Report, Corporal Ford described one incident in which officers had to repeat themselves and raise their voices to communicate with Officer Nguyen, **Def.'s Mot. Summ. J., Ex 8**, at 5-6;

b. **Admit** that during the same incident as that described above, ¶ 27.a, Corporal Ford wrote that Officer Nguyen "turn[ed] his back to the target location in order to hear and understand what the other officer was stating," *Id.* at 5;

c. **Admit** that Corporal Ford wrote in the same report that Officer Nguyen did not hear his commands so he did not follow his orders regarding taking control of the suspect, *Id.* at 6;

d. **Admit** that Corporal Ford also wrote that one time during a traffic stop, Officer Nguyen did not hear gun shots several blocks away, *Id.* at 6;

e. **Admit** that sometimes Plaintiff missed radio communications;

f. **Admit** that in his End of Phase 3 Report, Corporal Day wrote that Officer Nguyen did not hear the location of a shooting transmitted over the radio, nor did he hear a call regarding a stabbing, **Def.'s Mot. Summ. J., Ex. 10**, at 4-5;

g. **Admit**;

h. **Deny**. Corporal Ford wrote in his End of Phase 1 Report that Officer Nguyen took "approximately three times as long as a *tenured officer*" to complete certain reports, not three times as long as a normal recruit in Phase 1 of FTO, **Def.'s Mot. Summ. J., Ex 8**, at 4 (emphasis added);

i. **Admit** that Corporal Day wrote in his End of Phase 3 Report that there were a few times when Officer Nguyen did not immediately know his current location, **Def.'s Mot. Summ. J., Ex. 10**, at 3;

j. **Admit** that Corporal Juarez wrote in his End of Phase 2 Report that at times Officer Nguyen became disoriented when responding to a call, **Def.'s Mot. Summ. J., Ex. 9**, at 5;

k. **Admit** that Corporal Day wrote in his End of Phase 2 Report that Officer Nguyen did not take the most direct route from the station to a residence, **Def.'s Mot. Summ. J., Ex. 10**, at 3.

However, because, as discussed in the Statement of Additional Disputed Material Facts, many recruits in Officer Nguyen's class struggled in materially similar ways, Officer Nguyen denies that he was terminated for his performance rather than his hearing disability.

9

28.     **Admit** that Corporal Ford was Officer Nguyen's training officer in Phase 4 of FTO, and that recruits should perform 100% of the work in Phase 4. Otherwise, **admit** in part and **deny** in part as follows:

> a.  **Admit** that Corporal Ford wrote in his End of Phase 4 Report that Officer Nguyen was not always able to respond correctly when Corporal Ford quizzed him on his current location and did not always take the most direct route when going to calls, **Def.'s Mot. Summ. J.**, **Ex. 11**, at 3;

> b.  **Admit** in part. Defendant's statement is ambiguous when compared with what Corporal Ford wrote in his report. Per the report, Corporal Ford stated that "[w]hen writing a letter to detectives regarding a possible sexual assault" Officer Nguyen left out that "the victim had stated that she was raped"; Corporal Ford also wrote that Officer Nguyen "placed the victims of child abuse in the report as 'involved' instead of victims," *id.* at 4;

> c.  **Deny**. Corporal Ford wrote that Officer Nguyen "occasionally took 3-4 times the amount of time it would take a *tenured officer* to complete a report," not that Officer Nguyen took 3-4 times longer than expected, *id.* (emphasis added);

> d.  **Admit** in part. Corporal Ford wrote in his report that when he asked Officer Nguyen why he let the suspect reach inside his coat, Officer Nguyen stated he that was looking at the suspect's face and trying to communicate with him; Corporal Ford does not state that he had to intervene, *id.* at 5;

> e.  **Admit** that sometimes Officer Nguyen did not hear radio and other communications.

29.     **Admit**.

30.     **Admit** that Corporal Ford recommended that Officer Nguyen be placed in a two-week or possibly four-week remedial training phase after Phase 4 of FTO before advancing to a solo capacity. **Admit** that Officer Ford met with Corporal Ford, his FTO training supervisor, Sergeant Heimbigner, and others on February 7, 2014, to review the remedial training plan. **Admit** that purportedly the remedial training plan for Officer Nguyen focused both on report writing and radio listening and comprehension; however, the main focus of the meeting and the plan was Officer Nguyen's hearing disability. According to Defendant's records, "a lengthy

10

discussion was held concerning Recruit Nguyen's hearing disability and how it impacts his performance in a variety of rating areas, but specifically listening to the radio." **Ex. 5,** Record of February 7, 2014 Meeting on Remedial Training Plan. Officer Nguyen was informed that even if he successfully completed remedial training, a plan would be developed "to monitor his performance to ensure that his hearing deficiency [was] not impacting his ability to safely complete the job of patrol officer." *Id.*

> The written remedial training plan for Officer Nguyen stated:
>
> Hearing related concerns remained constant throughout all four phases of training. Recruit Officer Nguyen's hearing impairment . . . bleeds over into the area of effectively listening and communicating with other officers and citizens. It is important to note the following observations from Corporal Day from Phase Three when evaluating the likelihood of training being able to correct this deficiency. . . . "[T]here are still substantial concerns about Officer Nguyen's hearing disability, which prevents him from reliably hearing spoken voices at normal conversational volumes. . . . It does not appear that any amount of training or instruction is likely to have an impact on the natural medical impairment of Officer Nguyen's hearing."

**Def.'s Mot. Summ. J.**, **Ex. 15**, at 1-2.

31.      **Admit** that after one week of remedial training, Lieutenant Archer directed Sergeant Heimbigner to pull Officer Nguyen out of remedial training and begin termination procedures. **Deny** that Plaintiff showed no improvement. Indeed, Sergeant Heimbigner was impeached on that issue when explaining in his deposition why DPD "reversed course" in initially planning to provide Officer Nguyen with two weeks of remedial training (and possibly two more weeks after that), but then recommending termination after Officer Nguyen had five days remedial training. **Ex. 6**, Jerry Heimbigner Dep. 56:22-24, 57:8-58:7, Mar. 15, 2017. Sergeant Heimbigner testified that he agreed to termination rather than advocate for Officer Nguyen to finish remedial training out of a "concern for safety," and once he saw the DOR from Officer Nguyen's fifth day of remedial training and "some of the performance issues that

occurred on that day, [he] identified that progress was not going to be made to a sufficient level."

*Id.* at 60:12-19, 64:4-8. However, regarding Sergeant Heimbigner's specific concerns, the final

DOR of Officer Nguyen's training shows his performance was "acceptable" in both "Officer

Safety" categories. **Ex. 7,** 2/16/14 Daily Observation Report, at 3. The DOR from Officer

Nguyen's second-to-last day of remedial training shows Officer Nguyen's performance in

"Officer Safety: Suspects/Prisoners" was "near superior," and his performance in "Officer

Safety: General" was "acceptable." **Ex. 8,** 2/15/14 Daily Observation Report, at 2-3. Officer

Heimbigner was unable to explain why the DOR from the last day of Officer Nguyen's training,

or even from the second-to-last day, made him decide that "enough [was] enough" in terms of

pulling Officer Nguyen from remedial training rather than letting him finish remedial training

before deciding whether to allow his employment with DPD to continue. **Ex. 6,** Heimbigner Dep.

63:25-64:1, 84:22-85:16.

32.     **Admit**.

33.     **Admit** that Officer Nguyen met with Deputy Chief Quinones and other DPD

employees on February 19, 2014. During the meeting, Deputy Chief Quinones told Officer

Nguyen that because of his hearing deficiency, he would no longer progress in the training

phase. **Ex. 1**, Nguyen Dep. 203:22-25, 204:13-16; *see also* **Ex. 9**, Quinones Dep. 51:24-52:1,

Jan. 26, 2017 ("I told [Officer Nguyen] that his hearing disability contributed to some of the

factors that were leading us to making [the] decision [to terminate] him.").

34.     **Admit**.

35.     **Admit** that Chief White issued an order to Officer Nguyen on February 21, 2014,

stating that "until further notice" Officer Nguyen had "no police authority," was on "personal

leave . . . under the direction of Safety Human Resources," and was to "begin the interactive

process with the city." **Ex. 10**, Feb. 21, 2014, Order from Chief White to Officer Nguyen. **Deny**

that Plaintiff was "plac[ed] on leave *pending* the completion of the . . . interactive process," as

stated by Defendant. **Def.'s Mot. Summ. J.**, SOF, ¶ 35 (emphasis added).

36. **Admit** that Ms. Iversen sent Officer Nguyen a letter describing Defendant's

interactive process ("IAP") and instructing him to submit a Reasonable Accommodation

Questionnaire ("RAQ") to his medical provider. **Deny** that the RAQ required Officer Nguyen's

doctor to explain whether he was disabled and, if so, whether any reasonable accommodations

would allow him to perform the essential functions of his job. Rather, the RAQ instructed

Officer Nguyen's doctor "to provide information regarding . . . whether [Officer Nguyen] has a

physical or mental impairment that substantially limits one or more major life activities,

including any functional limitations or major bodily functions with limitations associated with

such impairment(s)," as well as "the impact [Officer Nguyen's] medical condition on his/her

ability to work and suggested accommodations that would enable [him] to perform the essential

functions of his . .  position," a description of which was purportedly attached. **Def.'s Mot.**

**Summ. J.**, **Ex. 22**, at 1.

While responses to these areas of inquiry may be intended to aid Defendant in

determining whether an employee is disabled under the ADA, it is less than clear a medical

provider would understand the purpose of the document as such. Indeed, Officer Nguyen's

doctor, Dr. Feehs, testified that he did not realize he was being asked to identify whether Officer

Nguyen's hearing loss was substantially limiting; he believed the information requested was

whether Officer Nguyen's hearing loss substantially limited "*any other[]*" major bodily

functions. **Ex. 11**, Feehs Dep. 70:13-21, Mar. 30, 2017. Dr. Feehs testified that he "was assuming

we all understood [Officer Nguyen] had the hearing loss, so [he] didn't need to say, yes, hearing

loss. It's the whole reason [he] got the form." *Id.* at 70:23-25. Dr. Feehs stated he did not

remember if he read the one plus page of single-spaced definitions provided with the RAQ that

defined the statutory terms used in the RAQ, and he testified he did not know what any of those

terms meant or their legal significance. *Id.* at 54:13-15, 66:18-68:10, 79:23-80:2. He further

testified that he did not remember seeing a job description attached to the RAQ. *Id.* at 81:22-

82:10. In fact, Defendant did not provide to Officer Nguyen's counsel during discovery or

provide to the Equal Employment Opportunity Commission ("EEOC") during this case's

administrative proceedings any job description as part of the RAQ packet. The record therefore

contains no indication that the RAQ was used by Dr. Feehs to explain whether Officer Nguyen

was disabled and how any such disability affected his ability to perform his job.

     **Admit** that Ms. Iversen's letter to Officer Nguyen instructed him to send the completed

RAQ to the City's ADA Coordinator.

     37.    **Deny**. Under the ADA and according to DPD's written ADA policy, the purpose

of the IAP is to determine whether a DPD officer "is a qualified individual with a disability

within the meaning of the ADA; and . . . if so, whether, the officer can be reasonably

accommodated in his/her position as a Denver Police Officer, or in a vacant Career Service

Position." **Ex. 12**, DPD ADA Policy, at 2. However, as discussed at length below in the

Statement of Additional Disputed Material Facts and § V.B.2, Defendant's only purpose in

entering into the IAP with Officer Nguyen was to make it appear like it complied with its ADA

obligations. Defendant had already decided to terminate Officer Nguyen by the time the IAP was

initiated, it had no intention to retain Officer Nguyen as a police officer regardless of Dr. Feehs'

responses to the RAQ, and it thus in fact had no intention to objectively determine whether

Officer Nguyen could perform the job of police officer with a reasonable accommodation.

38.     **Admit** that Plaintiff met with Dr. Feehs on March 26, 2014. Dr. Feehs filled out

the RAQ. Dr. Feehs does not remember whether he recommended that Officer Nguyen see one

of his practice's audiologists to discuss hearing aids. **Ex. 11**, Dr. Feehs' Dep. 46:19-47:4. **Deny**

that Dr. Feehs testified that hearing aids are not within his area of practice.

39.     **Admit** that Dr. Feehs' office sent the completed RAQ to Wilma Springer, DPD's

ADA coordinator, and that Dr. Feehs responded to some of the RAQ's questions as described by

Defendant. *See* **Def.'s Mot. Summ. J.**, **Ex. 22**, at 3-6. **Deny** that Ms. Springer discussed the

RAQ with Officer Nguyen. Officer Nguyen testified that he asked Ms. Springer a few specific

questions such as "if the doctor recommended stronger hearing aids and/or Bluetooth [FreeLinc]

device or something that helped [him] out in the past, what would happen next?" (to which she

responded that Defendant would put him "back into work"). **Ex. 1**, Nguyen Dep. 232:2-233:1,

241:15-23; 290:4-12. Ms. Springer never explained to Officer Nguyen that based on the RAQ

responses, Defendant intended to conclude that he was not disabled. *See id.* at 238:4-8.

40.     **Deny**. Ms. Springer ended the IAP, but she did so only after Officer Nguyen's

supervisors and the Safety Human Resources Department indicated to her that Officer Nguyen

was not returning to work as a police officer, regardless of Dr. Feehs' RAQ responses. In this

respect, on April 4, 2014, Ms. Springer emailed Ms. Iversen at Safety Human Resources and

informed her that she had received the RAQ, and Officer Nguyen's doctor stated he could return

to work without restrictions. **Ex. 13**, April 2014 Email String, at 2. She wrote that Officer

Nguyen's doctor was "recommending [Officer Nguyen] try new stronger hearing aids, [and] blue

tooth technology connecting to his hearing aids." *Id.* at 3. Ms. Springer further wrote that Officer

Nguyen was "in the process [of] scheduling his appointment for the ear mold and ordering the

hearing aids. . . . With the purchase he will have a 45-day trial. I recommend he is assessed

during this time to ensure he can perform the essential functions of his job, Police Officer." *Id.*

Ms. Springer **did not** say anything like Officer Nguyen's doctor said that that he was not

disabled or that she intended to so conclude. Indeed, it appeared she believed at that time that he

was disabled because otherwise there would have been no need to determine whether he could

perform the essential functions of the job of police officer with the reasonable accommodation of

using the new hearing aids.

Notably, Ms. Springer wrote at the bottom of the email: "NOTE: [Officer Nguyen] asked

if he could be placed in a different district, because ***he felt that his training Corporal, Kevin***

***Ford, will discriminate knowing his disability***. He wants the best out of his training, and does

not feel he will get that from Kevin." *Id.* (emphasis added). Although Ms. Iversen forwarded Ms.

Springer's email to Deputy Chief Quinones and Deputy Chief Mary Beth Klee, ***not one of those***

***three individuals*** (Iverson, Quinones, or Klee) responded to Officer Nguyen's allegation of

discrimination or took any steps to address it, including by informing the Executive Director for

the Department of Safety, Stephanie O'Malley. *See id.* at 2; *see also* **Ex. 14**, Iversen Dep. 61:25-

62:13, 69:16-70:6, Mar. 10, 2017; **Ex. 15**, Klee Dep. 27:22-28:15, 29:21-30:10, 35:16-36:1, Mar.

8, 2017; **Ex. 9,** Quinones Dep. 91:21-24, 93:24-94:9, 100:15-22, 101:6-20; **Ex. 16,**, O'Malley

Dep. 31:3-7, 32:4-9, 32:19-20 , Jun. 9, 2017. While Ms. Iversen testified that she felt that it was

Deputy Chief Klee's obligation to make inquiries regarding the discrimination allegation, **Ex. 14,**

Iversen Dep. 72:2-24. 87:5-88:1, Deputy Chief Klee testified that *only* if Officer Nguyen "was

going to go back into the field training program" would it have been incumbent on Defendant to

investigate the allegation of discrimination, **Ex. 15,**, Klee Dep. 30:5-10, 31:13-16, 33:19-34:2.

Similarly, Deputy Chief Quinones testified that he had no obligation to investigate Officer

Nguyen's discrimination allegation because he "had already made the decision he was not going

to advance." **Ex. 9,** Quinones Dep. 92:23-93:5. In other words, because Defendant had already made up its mind about terminating Officer Nguyen *before* initiating the IAP, nothing that occurred during the IAP would affect its decision, whether that be an allegation of discrimination or a reasonable accommodation recommendation by his doctor.

Indeed, in forwarding Ms. Springer's email to Deputy Chief Quinones and Deputy Chief Klee, Ms. Iversen wrote: "I recommend a conversation/meeting occur with [Ms. Springer] directly so she has a better understanding the hearing issue is more complicated than what is being presented by [Officer Nguyen]." **Ex. 13,** April 2014 Email String, at 2. Deputy Chief Quinones responded, "Did she [Ms. Springer] read any of the packet? Set up the meeting, but she needs to be up to speed on the issues in the packet and not be relying solely on his side of the story. Amazing!!" *Id.* Ms. Iversen wrote that she would provide Ms. Springer with the packet (which is the termination recommendation packet Sergeant Heimbigner prepared) the following Monday, but she had already provided her with the cover letter (the termination recommendation letter Sergeant Heimbigner wrote). *Id.*; *see also* **Ex. 9,** Quinones Dep. 91:5-9 (explaining packet); **Ex. 14,** Iversen Dep. 88:25-89:4 (explaining cover letter). Ms. Springer denied that she ever received either. **Ex. 17,** Springer Dep. 52:11-15, 53:7-9, 54:7-10, 54:15-20, Jan 27, 2017.

In fact, Ms. Springer never received any information, or had any discussions with any of Officer Nguyen's training officers or supervisors, regarding Officer Nguyen's performance during FTO, including the numerous, documented issues with his hearing, nor was she ever informed that Officer Nguyen's hearing loss was impacting his job (which certainly begs the question how she was supposed to make an informed decision regarding whether he was disabled and/or could perform the essential functions of his job with an accommodation). *Id.* at 13:14-21, 14:6-11, 16:8-10, 29:17-30:5. For instance, Ms. Springer testified that she was not "aware that

[Officer Nguyen's] training officers in the [DPD] believed that he was not adequately performing his job . . . because of his hearing impairment," despite the fact that she agreed that if he had a "hearing impairment that [was] preventing him from adequately doing his job, that [was] a disability under the ADA." *Id.* at 32:18-33:5. Ms. Springer did even not know that Officer Nguyen had a Pre-Employment Medical Agreement (nor had she ever seen a pre-employment medical agreement form before), although she agreed that the Agreement "seem[ed] to be talking about a reasonable accommodation for a medical condition of hearing loss," *id.* at 72:20-73:4, 80:13-17. She also agreed that the Agreement, as well as Officer Nguyen's pre-employment hearing evaluation record, put DPD on notice that Officer Nguyen possibly was disabled. *Id.* at 83:17-84:5.

So not only was Ms. Springer, purportedly the sole person who was supposed to be responsible for determining whether Officer Nguyen was disabled and entitled to a reasonable accommodation, extraordinarily underinformed regarding how his hearing loss substantially limited his ability to perform his duties as a police officer, the individuals responsible for terminating Officer Nguyen in fact were the ones who made the actual decision what to do with the results of the RAQ. As further illustration of this fact, Deputy Chief Klee wrote in response to Ms. Iversen's email: "[D]o we need to make it clear to Officer Nguyen that we are not telling him to move forward with those expensive hearing aids? It sounds like [Ms. Springer] indicated to him that he could return to work if he got them [and] that concerns me." **Ex. 13,** April 2014 Email String, at 1. And Ms. Iversen, in forwarding to Ms. Springer Deputy Chief Quinones's and Deputy Chief Klee's responses to Ms. Springer's original email, explained that "[Deputy Chief] Quinones . . . stated clearly to me they <u>will not allow</u> [Officer Nguyen] to return to the position of a Police Officer based on . . . all the data in the binder [packet] documenting significant

performance concerns. They want to ensure you understand the magnitude of the performance

failures/gaps." *Id.* Deputy Chief Quinones confirmed in his testimony that he did not intend to

allow officer Nguyen to return to work as a DPD officer, no matter what occurred in the IAP.

**Ex. 9,** Quinones Dep. 105:9-106:11.

Accordingly, Ms. Springer's decision to conclude the IAP and the determinations she

made in doing so were *not* based on Dr. Feehs' responses to the RAQ; the RAQ merely gave her

a convenient excuse to comply with Defendant's decision not to allow Officer Nguyen to return

to work.

**Deny** that Defendant terminated Officer Nguyen because of his performance failures. As

made clear by the fact, discussed below in the Statement of Additional Disputed Material Facts,

that other recruits with very similar failures were given numerous second (and sometimes third

and fourth) chances in remedial training to show they were qualified to be police officers,

Defendant terminated Officer Nguyen because of his hearing disability.

41.     **Admit** that Officer Nguyen saw Dr. Huerta on April 2, 2014, to order new,

stronger hearing aids (twenty days before the conclusion of the IAP and twenty-one days before

he was terminated). *See* **Def.'s Mot. Summ. J., Ex. 23, Ex. 25**. **Admit** that Officer Nguyen

chose a BTE style of hearing aid, to which he had previously been resistant because of his fear

its visibility would impair him in performing his job. *See* RSUMF, ¶ 25. **Deny** that Officer

Nguyen did not obtain hearing aids that fit him correctly until June or July 2014; Dr. Huerta

testified that although she had the molds remade several times to obtain the desired fit and

appearance of the hearing aids, "he was wearing the [new] hearing aids the entire time" (since

early May), as she did not "have to send in the old mold to get a remake." **Ex. 4,** Huerta Dep.

57:10-15; *see also id.* at 33:3-21, 40:15-42:21, 54:8-55:4, 56:7-19.

42.    **Deny**. Dr. Huerta testified that with his new hearing aids, there was a chance Officer Nugyen would have normal hearing and "the odds are in . . . favor that he would have close to normal hearing." *Id.* at 90:25-91:11. While she testified that she could not say "how much improvement [Officer Nguyen] received from [his] new aid versus [his] old" and she could not "quantify . . . how much [his hearing] improved," she could presume his hearing was better because "based on hearing aid capabilities, . . he had access to more sound." *Id.* 58:7-10, 70:7-21.

43.    **Admit** Officer Nguyen's hearing loss is moderate and Dr. Feehs testified that it will get worse as he gets older.[2] **Deny** that Officer Nguyen's hearing was not tested with his new hearing aids, given that Dr. Huerta expressly testified regarding a test she performed on May 7, 2014, when Officer Nguyen was wearing the new hearing aids. **Ex. 4,** Huerta Dep. 71:11-72:21; *see also* **Ex. 18,** May 7, 2014, Real-Ear Verification Test Results.

44.    **Admit** that Dr. Feehs testified that he did not know "whether or not, with his hearing aids, [Officer Nguyen] was able to hear well enough to be a police officer," **Ex. 11,** Feehs Dep. 50:19-22, and Dr. Huerta testified that she did not "intend to offer any opinion in this case regarding whether [Officer] Nguyen could perform the job of a police officer for . . . Denver," nor was she "qualified to make such an opinion," **Ex. 4**, Huerta Dep. 70:25-71:7 (although Dr. Feehs and Dr. Huerta are certainly qualified to opine whether Officer Nguyen is able to hear certain types of sounds that may determine his ability to perform the job).[3]

---

[2] However, predictions about Officer Nguyen's future hearing ability are irrelevant to this case given that, as this Court has explained, "the determination of whether an individual is a qualified individual with a disability must be made as of the time of the [adverse] employment decision." *Jacobsen v. Dillon Cos.*, No. 10-cv-01944-LTB-BNB, 2012 U.S. Dist. ELXIS 25019, at *22-23 (D. Colo. Feb. 28, 2012) (citation omitted).

[3] It is interesting to note, however, that Defendant states "[n]either Plaintiff's otologist nor audiologist are able to opine as to whether Plaintiff can hear well enough to perform the essential

45.     **Admit** that Officer Nguyen testified at his deposition that he believed he could perform the job of police officer when he was terminated from his employment with DPD. However, other than an alleged general expectation that Officer Nguyen would be able to understand the significance of Dr. Feehs' responses to the RAQ—i.e., that those responses meant Officer Nguyen was not disabled—Defendant did not inquire of Officer Nguyen while he was still employed whether he could perform the essential functions of his job without a reasonable accommodation, nor offer him any accommodation in response to a determination that he could not.[4] Officer Nguyen's after-the-fact beliefs about his abilities are not determinative whether Defendant had an obligation to provide him a reasonable accommodation.

## III.     STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS ("SADMF")[5]

1.     Since 2008, Officer Nguyen's dream has been to be a police officer. **Ex. 1**, Nguyen Dep. 41:19-21.

2.     In 2009, Officer Nguyen graduated from the Basic Law Enforcement Training Academy at Community College of Aurora and received his POST certification. **Ex. 20**, Nguyen Resume.

---

functions of the job of Denver Police Officer," **Def.'s Mot. Summ. J.** 11, considering that this is exactly what it admits it asked Dr. Feehs to do when it had him complete the RAQ. *See id.* at 10 ("The RAQ is a document in which the doctor must explain . . . whether any reasonable accommodations would allow [Plaintiff] to perform the essential functions of his job."). Indeed, according to Defendant, its entire IAP model relies exclusively on the employee's healthcare provider's determination whether the employee is substantially limited in any major life activity and whether he can perform the essential functions of his job. *See* **Ex. 19**, Def.'s Resp. to Pl's Disc., at 10, Jan. 24, 2017 (describing the IAP).

[4] The use of the wired earpiece was not an ADA accommodation DPD provided Officer Nguyen because, one, it was not provided in response to a recognition that his hearing disability prevented him from performing the essential functions of his job, and, two, nondisabled officers used earpieces with their radios as well. *See* **Ex. 22**, Urbina's End of Phase Reports, at 17.

[5] Context is everything in determining discrimination, which is why a jury is necessary to resolve this matter. Additional facts, some disputed and some undisputed, are provided herein as an attempt to provide context.

3.      In April 2011, Officer Nguyen successfully completed FTO at LSPD and was placed into a supervised patrol status. **Ex. 2**, Lakeside Police Department FTO Records, at 2. As discussed above, *see* RSUMF, ¶ 2, once LSPD purchased a FreeLinc device for him to use with his police radio, his ability to hear radio communications increased dramatically. Former LSPD Assistant Chief Terry Hughes, who hired Officer Nguyen, attested that Officer Nguyen did not have any issues in his job as patrol officer and Assistant Chief Hughes thought he was a "great police officer." **Ex. 21**, Terry Hughes Declaration, ¶¶ 6, 8.

4.      Before Officer Nguyen began his job with the DPD, he had a pre-employment medical examination, which included evaluation by an audiologist. Based on the evaluation, Defendant's Civil Service Commission (presumably the department in charge of hiring Officer Nguyen) was informed that Officer Nguyen had a "history of hearing loss and wears hearing aids. He does not meet the Med Tox criteria for hearing without his hearing aids." **Ex. 23**, Pre-Employment Medical Agreement and Hearing Evaluation, at 1-2.

5.      Also before beginning his job, Officer Nguyen executed a Pre-Employment Medical Agreement in which he acknowledged his "[h]istory of bi-lateral hearing loss and the use of bilateral . . . hearing aids." *Id.* at 3. Officer Nguyen further acknowledged that "the Conditions of Employment listed herein . . . are being offered me by the Denver Department of Safety ***as an accommodation for my medical condition of bi-lateral hearing loss***. The ***accommodation*** is being offered to help ensure that I am able to perform the essential functions" of the job of DPD officer. *Id.* (emphasis added). (Although the "Conditions of Employment," do not appear to have provided Officer Nguyen any "accommodation"; rather, they were conditions to which he had to agree to obtain employment. *Id.* at 4-5.)

22

6.      While his employment could have been terminated at any time in any phase of FTO if his training officers or training supervisors were concerned about any unacceptable safety risks Officer Nguyen posed to fellow officers, himself, or the public, Officer Nguyen completed all four FTO phases. *See* **Ex. 9**, Quinones Dep. 48:20-51:1; *see also* **Ex. 24,** DPD FTO Manual Ch. 4 – Phase Training, at 5 ("[A] recommendation for termination may be made at any time during the training program.").

7.      Officer Nguyen had many "Significant Strengths" throughout FTO. In Phase 1, such strengths included "Situation Management Physical," which involved obtaining and maintaining physical control over resistant suspects/arrestees. in which he showed "at times near superior skills and abilities." **Def.'s Mot. Summ. J., Ex. 8,** at 1-2. In Phase 2, his training officer noted eight categories of significant strengths, including "Officer Safety," regarding which his training officer listed several examples of Officer Nguyen's competent officer safety practices and stated:

> Officer Nguyen's officer safety is good, he is able to foresee possible dangerous situations and he uses good tactics when responding to calls. Officer Nguyen is able to communicate with other officers on tactical situations and he is aware of cover/concealment. . . . Officer Nguyen is aware of his surroundings when approaching suspects and he uses proper Arrest Control Techniques. Officer Nguyen is aware of suspect's movements and is quick to conduct a pat-down for officer safety. Officer Nguyen maintained control of his prisoners at all times and took a position of advantage when controlling prisoners.

**Def.'s Mot. Summ. J., Ex. 9**, at 1-4. "Field Performance: Stress Conditions" was one of Officer Nguyen's significant strengths in Phase 3, with his training officer stating that he "performed exceptionally" in stressful situations. **Def.'s Mot. Summ. J., Ex. 10**, at 1-3. The same category was listed among Officer Nguyen's significant strength in Phase 4 as well. **Def.'s Mot. Summ. J., Ex. 11**, at 1-3.

8.      However, Officer Nguyen's training officers also noted their concerns about Officer Nguyen's "documented hearing disability" and how it affected his performance. **Def.'s Mot. Summ. J., Ex. 10,** at 4; *see also*, *e.g.*, *id.* at 6; **Def.'s Mot. Summ. J., Ex. 8**, at 5, 7, 9-10; **Def.'s Mot. Summ. J., Ex. 11**, 5-6, 9-10.

9.      In addition to Officer Nguyen's training supervisors, including Sergeant Heimbigner, Lieutenant Archer, and Deputy Chief Quinones receiving the DORs and End of Phase Reports that noted concerns regarding Officer Nguyen's hearing, communications among these supervisors show that they were well aware of Officer Nguyen's hearing issues. For instance, on December 18, 2013, when Officer Nguyen was in Phase 2, Sergeant Knutson (the FTO training coordinator at the Academy) emailed Lieutenant Archer: "[T]he root of almost all of [Recruit Officer] Nguyen's significantly poor performance revolves around his hearing loss. . . . There are some serious officer safety risks that have been documented due to his hearing loss. . . ." **Ex. 25,** Dec. 18 2013 Email from Knutson to Archer. On February 2, 2014, in the middle of Phase 4, Sergeant Knutson emailed Sergeant Heimbigner that he had "just peaked at [Officer] Nguyen's Phase 4 DORs. Is his performance related to his hearing?" **Ex. 26,** Feb. 2, 2014 Email from Knutson to Heimbigner.

10.      DPD's ADA policy provides that "[t]he Department ***shall*** engage in the ADA interactive process upon notice of a police officer's need for reasonable accommodation." **Ex. 12,** DPD ADA Policy, at 2 (emphasis added).  The policy expressly states that the DPD has notice of a police officer's need for reasonable accommodation—the "duty to engage in the IAP is triggered"—either "[w]hen an officer provides notice that he/she needs a reasonable accommodation for a physical or mental impairment" or "***[w]hen the Department has actual or***

***constructive notice that a police officer may have a disability for which that officer needs a reasonable accommodation***." *Id.* (emphasis added).[6]

11.     Yet despite its clear awareness of Officer Nguyen's hearing issues, Defendant did not initiate the IAP until Officer Nguyen spoke with Ms. Iversen after his February 20, 2014, meeting with Deputy Chief Quinones in which Deputy Chief Quinones essentially told him he was fired; Ms. Iversen determined Defendant needed to initiate the IAP because Officer Nguyen told her something like he felt that his performance challenges were due to his hearing. **Ex. 14,** Iversen Dep. 18:7-11, 20:10-20. According to Ms. Springer, Defendant's ADA Coordinator, however, the DPD/Safety Human Resources should have initiated the IAP within twenty days of when "there was substantiating indications to indicate that [Officer Nguyen] would need an accommodation." **Ex. 17,** Springer Dep. 82:24-23, 83:10-16.

12.     The termination recommendation letter that Sergeant Heimbigner prepared confirmed that many of Officer Nguyen's performance difficulties related directly to his hearing disability. Sergeant Heimbigner included many of the observations of Officer Nguyen's training officers from DORs and End of Phase Reports and stated that "[a] second opinion from an audiologist confirmed that Officer Nguyen's hearing aids were the best available for his condition and there were no other aids that could improve his hearing." **Def.'s Mot. Summ. J.**, **Ex. 17,** at 2-3, 7, 10-11. (However, no DPD employee had ever discussed Officer Nguyen's hearing with an audiologist, and Officer Nguyen never told his training officers that an audiologist had said that there were no other aids that could improve his hearing. *See* RSUMF,

---

[6] DPD's ADA policy states that it is "intended to comport with the requirements of the consent decree entered by the U.S. District Court in *United States v. City and County of Denver . . . .*" **Ex. 12,** DPD ADA Policy, at 1; *see also* § I.

¶¶ 21, 26.) Sergeant Heimbigner thus concluded, without talking to Officer Nguyen, that Officer

Nguyen's hearing disability required his termination:

> This leads me to believe that no amount of training or remedial efforts will bring Officer Nguyen up to an acceptable level of performance. . . . The inability to hear effectively is a contributing factor to the safety of Officer Nguyen, other police officers and the general public.. . . Officer Nguyen's hearing disability has identified a variety of situations that pose risk in many different forms. . . . Placing Officer Nguyen in a solo capacity as a patrol officer would pose an unacceptable and unnecessary risk to the Denver Police Department and the citizens of Denver.. . . There are limited compensating behaviors that can be effectively utilized because without acceptable hearing most forms of communicating frequently used by police officers will always suffer. . . .Continuing Officer Nguyen in the field training and evaluation program would not result in a change in performance since the problem cannot be corrected medically or through training.

**Def.'s Mot. Summ. J.**, **Ex. 17**, at 11. Sergeant Heimbigner did not discuss report writing,

orientation, or any other performance category in this "Conclusions" section. *See id.*

     13.     Sergeant Heimbigner also attached a report to his termination recommendation

letter that listed every entry in Officer Nguyen's DORs in which he had received a score less

than four (which was considered "acceptable") in the category of Radio: Listens and

Comprehends. **Ex. 27,** Attachment to Feb 17 2014 Termination Recommendation – Radio

Listens and Comprehends Sub Fours. Sergeant Heimbigner did not write a "Sub Fours" report on

any other category such as "Officer Safety," "Report Writing," or "Orientation." **Ex. 6,**

Heimbigner Dep. 88:2-14. Sergeant Heimbigner testified that he wrote the "Sub Fours" report on

"Radio Listens and Comprehends" because "that was the most significant shortcoming [Officer

Nguyen] had." *Id.* at 90:14-25. Sergeant Heimbigner further testified that one of Officer

Nguyen's "major deficiencies" was hearing and it was the deficiency that "had the most serious

concerns that relates to . . . safety," *id.* at 15:8-19; that the fact that Officer Nguyen's hearing

"was never going to get better" was "a major component" in his decision to recommend

termination, *id.* at 23:9-20; and that the "consistent thread throughout the[] end of phase reports" was that "officer safety is at risk with Officer Nguyen's hearing impairment," which was "not going to get fixed," *id.* at 44:5-14. Sergeant Heimbigner added that it was "difficult to predict what [Officer Nguyen's] performance would have been had he had better hearing." *Id.* at 45:7-8.

14.     Deputy Chief Klee agreed in her deposition testimony that Officer Nguyen's "hearing issue . . . cause[d] him problems during training." Surprisingly, however, when Officer Nguyen went to talk to Deputy Chief Klee after his termination, she told him that his termination had "little to do with [his] disability" and more "to do with [his] orientation [and] report writing." **Ex. 1,** Nguyen Dep. 248:22-249:2.

15.     Other DPD employees who participated in the decision to terminate Officer Nguyen's employment, such as Deputy Chief Quinones and Director O'Malley, similarly testified that Officer Nguyen's hearing issues  played a role in his termination. *See* **Ex. 9,** Quinones Dep. 14:17-21, 15:20-21, 30:2-11, 45:23-4; **Ex. 16,** O'Malley Dep. 17:7-12.

16.     Yet despite his supervisors' belief that his hearing played a significant role in his performance deficiencies, the IAP, which supposedly was initiated to determine whether Officer Nguyen could perform his job with a reasonable accommodation for his hearing impairment, *see* **Def.'s Mot. Summ. J.** 10, could not have affected Officer Nguyen's future with the DPD because by the time the IAP concluded, the decisionmakers involved had already recommended and approved Officer Nguyen's termination. Sergeant Heimbigner recommended termination February 17; Officer Nguyen's District Commander, Commander Nagle, approved the recommendation February 18, as did Lieutenant Archer on February 19. *See* **Def.'s Mot. Summ. J.**, **Ex. 17**, at 1, 12. Deputy Chief Quinones approved the recommendation in February 2014, before the IAP began. **Ex. 9,** Quinones Dep. 17:21-24, 75:10-16. And Director O'Malley, "the

last signator [sic] relative to the decision-making process," testified she probably approved termination in February as well. **Ex. 16,** O'Malley Dep. 7:1-2, 62:5-13. Deputy Chief Klee testified that the decision to terminate Officer Nguyen had been at made by April 4, 2014, when Ms. Springer emailed Ms. Iversen about Officer Nguyen's intent to purchase new hearing aids. **Ex. 15,** Klee Dep. 39:11-20, 40:18-24; 44:22-45:5, 45:19-25.

17.     Indeed, Deputy Chief Klee told Officer Nguyen after he was informed of his official termination that Defendant "had to sit on the files for several weeks to figure out what to do with [him]" **Ex. 1,** Nguyen Dep. 249:5-6. DPD Internal Affairs Technician Ron Oroskovich also told Officer Nguyen, during or right after the February 20 meeting in which he was placed on leave, that the Manager of Safety (meaning Director O'Malley) had already signed off on his termination. *Id.* at 267:25-268:22.

18.     According to Director O'Malley, "if somebody's terminated, that means they're terminated." **Ex. 16**, O'Malley Dep.68:5-6. So, once she approved Officer Nguyen's termination, he could not remain as a police officer with DPD because his employment was over. *See id.* at 67:25-68:9. It thus did not matter what determinations were reached during the IAP because Defendant had already reached its decision to terminate Officer Nguyen by the time the IAP concluded, which occurred on April 22, 2014, the day before Defendant sent Officer Nguyen his official termination letter. *See* **Def.'s Mot. Summ. J., Ex. 23** (conclusion of IAP), **Def.'s Mot. Summ. J., Ex. 25** (termination letter).

19.     It appears that the results of the IAP were essentially irrelevant to Defendant also because even though Dr. Feehs' RAQ answers were internally inconsistent, no one ever contacted him or Dr. Huerta to follow up. For instance, under "[w]hat, if any corrective measures . . . are the patient pursuing to address [his] diagnsoed condition(s)," Dr. Feeehs wrote, "Patient

28

is to try new stronger hearing aids." **Def.'s Mot. Summ. J.**, **Ex. 22**, at 4. The RAQ then asked, "[i]n response to the previous question concerning corrective measures . . . , please specify what, if any, of the patient's life activities and/or major bodily functions are substantially limited by the patient's diagnosed condition(s). Please state if no major life activities or major bodily function are substantially limited." *Id.* Dr. Feehs responded "none."  And regarding "what reasonable accommodations would enable the patient to perform [his] job," Dr. Feehs wrote "blue tooth technology for connecting to with his hearing aids."  *Id.* at 6. But if an individual is not substantially limited in his major life activities or major bodily functions, under the ADA, he is not disabled and not entitled to a reasonable accommodation. Despite this indication that Dr. Feehs was at least somewhat confused about the RAQ, none of Defendant's employees ever called Dr. Feehs for clarification or to ask him generally about Officer Nguyen's condition. **Ex. 17,** Springer Dep. 25:7-9**; Ex. 11,** Feehs' Dep. 71:10-16, 74:15-19. Likewise, Defendant did not contact Officer Nguyen's audiologist, Dr. Huerta. **Ex. 4,** Huerta Dep. 83:10-13.

If someone from Defendant had contacted Dr. Feehs, Defendant would have learned that, as discussed above, he meant Officer Nguyen had no substantial limitations *other than his hearing loss*. RSUMF, ¶ 36. Had they contacted Dr. Huerta, Defendant would have learned there never was "any question . . . [that] James Nguyen had a serious hearing issue" and he "needed hearing aids in order to have even close to normal hearing." **Ex. 4,** Huerta Dep. 83:2-9.

20.     Ms. Springer admitted that she did not know whether Dr. Feehs read the definitions that accompanied the RAQ, nor did she not call him to follow up, despite that there was "some confusion" with Dr. Feehs' answers. **Ex. 17,** Springer Dep. 25:7-9, 26:20-23, 61:4-19. Rather, because Dr. Feehs "answered the most important part of the questionnaire," which in her opinion was whether Officer Nguyen's major life activities or major bodily functions were

substantially limited, she had enough information "based on the responses" from Dr. Feehs to determine Officer Nguyen was not disabled. *Id.* at 61:25-6, 63:17-20.

21.     Yet Ms. Springer herself, Defendant's ADA coordinator, testified that the determination how to evaluate whether someone has a disability is "complicated." *Id.* at 88:11-19. Indeed, she did not know whether under the ADA, in determining whether an impairment substantially limits a major life activity, the ameliorative effects of mitigating measures (such as hearing aids) should be considered (which they should not). *Id.* at 86:23-87:17; *see also id.* at 29:5-8 (stating that "hearing loss that requires a hearing aid is [not] considered a major impairment"). When asked whether it thus is "surprising that the doctor may screw up the [RAQ] and not understand how [lawyers] measure a disability even though [the RAQ packet] gives them directions on how it's all done," Ms. Springer answered, "I hear what you're saying, but I also had [Officer Nguyen] agreeing with the documentation. He had no argument that it should be anything different." *Id.* at 88:20-89:8.

22.     Regarding the familiarity of other employees of Defendant with the ADA, Corporal Ford testified that the only relevant training he may have had was when he was in the Academy; he was never trained regarding what to do if he believed one of his FTO trainees had a disability. **Ex. 28,** Ford Dep. 57:17-23, 81:14-20. Sergeant Heimbigner likewise testified he did not have specific training regarding what to do if he was supervising the training of a recruit with a disability but "[his] understanding [was] . . . if a person does have a disability, then they would reach out to [DPD] and tell [DPD] what that is so [DPD] could assist them." **Ex. 6,** Heimbigner Dep. 41:1-18. He believed that a determination whether Officer Nguyen had a disability would "have occurred during the hiring process." *Id.* at 30:10-16.

23.     Despite his disability, Officer Nguyen performed well at his police officer job with LSPD before he went to work for DPD, and he continues to do so now that he is back at LSPD. *See* **Ex. 29,** Richard Harris Declaration; **Ex. 30,** Sam Vecchiarelli Declaration; **Ex. 21,** Terry Hughes Declaration. Much of that success is due to his use of the FreeLinc with his police radio. **Ex. 21,** Richard Harris Declaration ¶ 8; RSUMF ¶ 2.

24.     Officer Nguyen's current performance at LSPD is also positively affected by the new hearing aids he ordered during the IAP, right before Defendant fired him. Officer Nguyen testified that in his experience, the hearing aids he wears now are better than the ones he had while working as a DPD officer. **Ex. 1,** Nguyen Dep. 257:9-12. He testified that the new hearing aids transmit sound "better, louder, [and] clearer," and have features such as volume control that his old hearing aids did not have. *Id.* at 257:24-258:10.

25.     Dr. Huerta confirmed that Officer Nguyen's new hearing aids "ha[ve] a lot more power, so . . . they were . . . more appropriate for his hearing loss" and they give him more volume. **Ex. 4,** Huerta Dep 93:17-23. Consequently, Officer Nguyen "had access to more sound," and Dr. Huerta presumed he had better hearing ability than he had with his old hearing aids, which he verified. *Id.* at 70:2-21; *see also id.* at 51:6-12, 51:20-22, 52:2-6. Having better access to sound, according to Dr. Huerta, also would "improve[] [Officer Nguyen's] overall ability to interact with people and hear things in his environment." *Id.* 87:16-23. She further explained that Officer Nguyen's new hearing aids would be helpful "in distinguishing radio calls from background noise or important information being given in a crowd";

> [H]e's going to have more environmental awareness. He will be able to hear those softer sounds, hearing the radio pick up or the radio go on over here or maybe someone walking up behind him. Since he has greater access to all that sound, it not only increases—makes it easier to hear speech, but he also has more environmental cues [that] he has access to as well.

31

*Id.* at 89:9-90:5. The new hearing aids thus "definitely improved [Officer Nguyen's] ability to hear." *Id.* at 86:25-87.

26.     Plaintiff's expert witness, Dan Montgomery, a retired police chief, corroborated Dr. Huerta's testimony regarding Officer Nguyen's hearing ability when he went on a "ride along" with Officer Nguyen at his LSPD job on March 2, 2017. **Ex. 3,** Dan Montgomery Expert Witness Report, at 9. Mr. Montgomery "did not notice any problems whatsoever with [Officer Nguyen's] communication skills in terms of hearing, listening, and conversing." *Id.* at 9-10. Mr. Montgomery "would talk in very soft tones, sometimes looking out of the right side window while [he] was talking, and Officer Nguyen was able to hear [him], understand what [he] was saying, and was able to converse." *Id.* at 10. On "at least two or three occasions," when Officer Nguyen and Mr. Montgomery were conversing in Officer Nguyen's patrol car, "Mr. Montgomery missed [radio] calls that Officer Nguyen . . . . picked up on. " *Id.*  Mr. Montgomery noted that Officer Nguyen "did not miss any calls." Mr. Montgomery also described speaking loudly while he was walking about 50 to 70 feet behind Officer Nguyen, and Officer Nguyen hearing him. *Id.* Overall, Mr. Montgomery opined that, based on the ride along, his meeting with Officer Nguyen's supervisors at LSPD (including Assistant Chief Vecchiarelli, who "spoke very highly of Officer Nguyen's performance"), and Mr. Montgomery's experience and expertise in the field of policing, Officer Nguyen is "able to perform the essential job functions of being a police officer." *Id.* at 13. Mr. Montgomery added that Officer Nguyen is "successfully performing his duties with the [LSPD] and his hearing disability has been adequately addressed with reasonable accommodations in the form of his hearing aids [and] his Bluetooth wireless transmitter/receiver [the FreeLinc device]." *Id.* at 7.

27.     However, unlike other recruits from Officer Nguyen's Academy class who had similar performance issues as he did (minus the hearing disability component), Defendant did not give Officer Nguyen a full chance to succeed as a DPD officer. For instance, other recruits were provided with full two-week (or more) remedial training phases immediately after phases in which they had significant performance difficulties. Thus:

a.  Officer Ramirez had a two-week remedial training phase in the middle of Phase 4 after struggling with, among other things, "**Report Writing**," "**Officer Safety**" and "**Radio: Listens and Comprehends**" in Phase 3. **Ex. 31,** Ramirez End of Phase Reports, at 6-7, 9.

b.  Officer Urbina had a two-week remedial training phase after Phase 3 after failing to meet the training requirements in each of the previous three phases in "**Officer Safety**" and "Situation Management." **Ex. 22**, Urbina's End of Phase Reports, at 31.

c.  Officer Yballa had a two-week remedial training phase in the middle of Phase 2 to "immediately improve" in the areas of "Acceptance of Feedback," "**Orientation**," "**Routine Forms**," and "**Report Writing**." **Ex. 32,** Yballa's End of Phase Reports, at 11.

d.  Officer Young had a two-week remedial training phase after Phase 3 because throughout the phase, he had maintained unacceptable scores in "Knowledge of Department Policies and Procedures," "**Routine Forms**," "**Report Writing**," "Self Initiated Field Activity," and "**Orientation**." **Ex. 33,** Young's End of Phase Reports at 18-20.

e.  Officer Morales had a two-week remedial training phase during Phase 3 after struggling with "Field Performance: Stress Conditions," "**Orientation/Response Time to Calls**," and "**Officer Safety**." **Ex. 34,** Morales' End of Phase Reports, at 33-38. Officer Morales then received a **second** two-week remedial training phase after he continued to struggle in those areas. *Id.* at 41. When he *still* failed to perform acceptably, he was given a **third** two-week remedial training phase because his training supervisors had "great[] concern" regarding his performance in "**Officer Safety,**" "Decision Making," and "Field Performance." *Id.* at 41-61.

f.  Officer Ross had a seven-day remedial training phase after Phase 2 to reach "an acceptable level of performance" in "Knowledge of Department Policies and Procedures," "**Routine Forms**," "**Report Writing**," and "**Orientation**." **Ex. 35,** Ross's End of Phase Reports, at 7.

g. Officer Quintanilla had a two-week remedial training phase after Phase 4 for additional training on "**Officer Safety**," "Situational Awareness," "Problem Solving," and "Decision Making." **Ex. 36,** Quintanilla End of Phase Reports, at 22.

h. Officer Saunier had a two-week remedial training phase after Phase 3 because of "demonstrated deficiencies" in "Departmental Procedure and Policies," "**Orientation**," "**Report Writing**," and "**Officer Safety**." **Ex. 37,** Saunier's End of Phase Reports, at 14.

i. Officer Eret had a two-week remedial training phase after Phase 3 because he was "having serious problems in areas which will directly affect his performance, safety and ability to perform as a solo police officer." **Ex. 38,** Eret's End of Phase Reports, at 17. These areas included "**Route Forms**" and "**Report Writing**" (his training supervisor noted that Officer Eret "had several instances where his paperwork would have led to dismissal of a charge against an offender"), as well as "**Officer Satiety**." *Id.* at 17-18. Officer Eret then received a **second** two-week remedial training phase because of difficulties in areas such as "**Routine Forms,**" "**Report Writing**," and "**Officer Safety**." *Id.* at 19-23.

j. Officer Botello had a two-week training phase after Phase 2 due to not meeting training requirements in several categories, with the areas of greatest concern including "Situation Management," "Driving," "**Radio: Listens and Comprehends**," and especially, "**Officer Safety**." **Ex. 39,** Botello End of Phase Reports, at 24-25.

k. Officer Sheppard had a two-week training phase after Phase 2 for "maintain[ing] unacceptable scores in the areas of "Knowledge of Department Policies and Procedures," "**Routine Forms,**" and "**Report Writing**." **Ex. 40,** Sheppard's End of Phase Reports, at 28. Officer Shepperd received a **second** remedial training phase because of his "lack of progress" in his first remedial training phase and his unacceptable scores in that phase in the areas of "**Routine Forms**," "**Report Writing**," "Investigative Skill" "Interview/Interrogation Skill," and "**Officer Safety**." *Id.* at 26-27.

l. Officer Davis had a two-week training phase after Phase 3 to address his shortcomings in, among other things, "**Routine Forms**," "**Report Writing**," and "**Orientation and Response Time to Calls**," which had been "an extreme challenge." **Ex. 41,** Davis End of Phase Reports, at 21-24. Officer Davis had a **second** remedial training phase after the first due to unacceptable scores in "Knowledge of Department Policies and Procedures," "Self Initiated Field Activity," "**Officer Safety**" and "**Orientation**." *Id.* at 26-30.

28.     Each of the above officers successfully completed FTO and moved into a solo

patrol capacity after their remedial training phases, despite the fact that their End of Phase

Reports show that many had had significant weaknesses very similar to those for which

Defendant claims Officer Nguyen was fired. For instance:

a.   Regarding Officer Ramirez:

- He "would occasionally enter inaccurate information" and omit necessary information on routine forms and reports, **Ex. 31,** Ramirez's End of Phase Reports, at 6-7;
- He was often "very slow to complete his reports," *id.*;
- "On one occasion, he failed to order a party to show their hands which were concealed behind them, "*id.*;
- He let "stopped pedestrians mill about whilst he did MDT data entry," *id.*; and
- "Oftentimes, he demonstrated that he did not listen to and comprehend radio traffic" as he "occasionally missed his call sign," "sometimes did not notice when another car was dispatched to his location or one very nearby," "[w]hen quizzed, . . . frequently could not tell the content of the last transmission aired," and "sometimes ignored or did not hear the dispatcher calling for cars on high priority calls," *id.*

b.   Regarding Officer Urbina:

- She had problems with orientation and response times to calls and at times "was unable to respond to calls in an appropriate amount of time and put herself and others' safety in jeopardy," **Ex. 22,** Urbina's End of Phase Reports, at 3, 11, 22;
- She "did not take control of [the] movements" of suspects and suspicious parties, including a "dangerous subject[] *id.* at 4,10, 16-17;
- "[O]n several occasions [she] did not recognize an officer safety hazard and placed herself as well as her cover officer's safety in jeopardy," *id.*;
- She "periodically demonstrated an inability to compete repots in an acceptable timeframe," *id.* at 9, 23;
- She had "trouble maintaining control or making decisions under stressful conditions" and would "freeze up" or become "'paralyzed' by inaction," which sometimes entailed placing herself, her training officer, and other officers at risk, *id.* at 9-10, 23, 29;
- She demonstrated unacceptable performance in the area of officer safety, *id.* at 4, 10;
- One time when contacting two suspicious parties, she ignored one while talking to the other, and even though the one she ignored had jammed his hands in his pockets, she made no attempt to give additional orders or have him remove his hands from his pocket, *id.* at 10;
- She did not attempt to pat-down or control the movements of a suspect who she had been advised had an "extensive known criminal history," was "armed with a knife," and "had threatened to "cut out" the victim's

uterus," and instead "she allowed him to keep his hands in his pockets," *id.* at 11;

- She let another suspect time reach into his pant pocket "completely ignor[ing] the potential danger/threat signs," and her training officer had to tell her "to request cover and get her Taser ready," *id.* at 17;

- When the owner of a suspicious unoccupied vehicle walked up "with his hands inside of his pockets," she "never told [him] to remove his hands from his jacket," *id.*;

- She "displayed a weakness when it came to listening to radio traffic especially if she was doing something else," she missed "tone alerts, calls of serious nature or information from other districts, and calls in her own district," and "on one occasion," she did not hear a radio transmission involving "a stolen vehicle that was involved in a hit and run," *id.* at 17, 24;

- She had difficulty completing routine forms and "[o]ften times, . . . she completely left the necessary information out (blank)," *id.* at 16, 22-23; and

- She "demonstrated significant weaknesses in regards to her searches of prisoners" in Phase 4 and conducted an improper search where later a knife was found on the suspect, *id.* at 29.

c.   Regarding Officer Yballa:

- He demonstrated significant weakness in "Routine Forms: Accuracy and Completeness," **Ex. 32,** Yballa End of Phase Reports, at 1, 3, 10;

- He demonstrated significant weakness in Report Writing: Organization/Details, "often omitting pertinent details," *id.*; and

- "It would take [him] two or three times the amount of time a non-probationary officer would take to complete a simple report," *id.* at 4.

d.   Regarding Officer Young:

- He had difficulty completing forms that were accurate and complete, including not completing "missing person details in a runaway report," **Ex. 33,** Young's End of Phase Reports, at 2, 6, 10, 13, 13;

- He "took an exceptionally long time to complete reports," *id.*;

- He had "some difficulty taking the most direct route to calls" and "[o]n a few occasions had no idea how to get to calls and had to be directed there by [his training officer]," *id.* at 10; and

- He struggled with "Officer Safety" in Phase 4, *id.* at 17.

e.   Regarding Eric Morales:

- He had trouble with orientation and "didn't always take the most direct route to calls," including incidents in which he went the wrong way, **Ex. 34,** Morales' End of Phase Reports, at 5;

- He had trouble with accuracy on reports and omitted necessary information, including information provided by victims and witnesses, *id.* at 5, 9-10; and
- He had significant problems with "Officer Safety," including one incident in which he "failed to gain control (verbally) of a domestic violence suspect who was reportedly armed with a gun" and was "standing between [him and his training officer] and the crying victim (who was seated on the stairs behind him)," *id.* at 10-11, 15, 19-20.

f.   Regarding Officer Ross:

- He struggled with "Routine Forms" regarding accuracy and completion, would "skip boxes or even lines of information on his paperwork," and omit "key details," **Ex. 35,** Officer Ross's End of Phase Reports, at 5, 8, 12;
- He demonstrated "an inability to organize his thoughts [in] his reports" and many times his narratives, probable cause statements, and officer statements did not contain "enough information to support the crime in which he was charging," *id.* at 5, 9;
- His reports were often "plagued with spelling and grammatical errors," *id.* at 2, 5; and
- He took "a substantial amount of time to complete the simplest of reports" and took over twice as long as he should have on a report in Phase 4; *id.* at 5, 12, 17.

g.   Regarding Officer Quintanilla:

- He struggled with radio listening and one of his greatest weaknesses in multiple phases was missing when dispatch was attempting to call him and not hearing important information when responding to a location such as the description of a suspect, details of the complaint, or where his fellow officers were, **Ex. 36,** Quintanilla's End of Phase Reports, at 3, 9;
- In his remedial training phase after Phase 4, "[o]n two separate occasions, [Officer] Quintanilla failed to hear or comprehend and react accordingly to critical calls for assistance" and "[b]oth calls involved officer safety concerns/issues," *id.* at 24;
- He had an incident in which he was responding to a suspicious vehicle call and after entering the parking lot that was the location of the call, he "did not notice, nor was he looking for" the vehicle that was the subject of the call, such that he was driving toward the suspects when his training officer alerted him to the fact that that was probably the vehicle they were looking for (and the driver was later found with a handgun on the floor of the front seat), *id.*:
- He displayed significant weakness in orientation and response time to calls, *id.* at 7;

- He would miss necessary information and crucial details and observations in gathering information for routine forms and struggled with including important details in his reports, *id.* at 8, 12;
- He consistently took three times as long to complete his reports compared to a veteran patrol officer, *id.* at 13; and
- He had difficulty practicing acceptable officer safety especially when dealing with suspects (including failing to control their movements) and/or approaching target locations, and in Phase 4, "his mistakes were so potentially dangerous the Training Officer had to intervene. . . . Not only was he placed in a bad position, the Training Officer and General Public were also," *id.* at 9, 13, 19-20;

h.   Regarding Officer Saunier:

- He struggled with report writing and completing routine forms accurately and completely and some of his narratives lacked important details, **Ex. 37,** Saunier's End of Phase Reports, at 3, 8, 11, 21;
- He had issues with officer safety, including letting suspects get behind him, which left his gun side exposed, and failing to control suspects' movements, *id.* at 12, 16, 20; and
- He struggled with orientation and response time to calls and on one occasion was unsure of his location after stopping to speak with a transient in an alley and on another he went the wrong way when proceeding to a call, *id.* at 16;

i.   Regarding Officer Eret:

- He had problems finding addresses he was dispatched to and taking the most direct route, **Ex. 38,** Eret's End of Phase Reports, at 1, 4;
- He had difficulty choosing the correct forms and accurately completing them, he would leave out important information in forms and reports, including omitting location of offense, venue, and identification of all parties involved in probable cause statements, and one time he failed to include the victim's identification of the suspect *id.* at 1, 4, 6-7, 9-10;
- He spent unnecessary time on simple reports, *id.* at 7; and
- He had some officer safety issues "which placed his life/safety as well as that of his training officer in danger," including letting a suspect in a vehicle he had stopped reach first under the front side of the passenger seat and then around to the back of the front passenger seat, *id.* at 1-2, 7, 11-12;

j.   Regarding Officer Botello:

- She displayed significant weaknesses in filling out routine forms accurately and completely and writing reports containing the required information, **Ex. 39,** Botello's End of Phase Reports, at 2;

- She struggled with listening and comprehending the radio and would not hear the nature, location, or important details of a call, *id.* at 3, 19;
- She struggled with field performance under stress and non-stress situations and her performance difficulties would be compounded when she did not know how to get to a location of a call, leading her to lose sight of her officer safety skills *id.* at 5-6, 13, 18-19;
- She demonstrated significant weakness in officer safety and had various officer safety failures such as repeatedly not being aware of her surroundings and failing to properly pat-down or search suspects and allowing them to put their hands in their pockets, *id.* at 2-3, 6-7, 22-23; and
- She had an incident in which she presented a violent felony offender with the opportunity to grab her gun, another in which she made no attempt to pat down a suspect for weapons and at one point during the contact the suspect "reached his hands into his pockets and fiddled around for a moment" and she "had no reaction to the movement and did not even appear to notice," and yet another in which she let a subject keep his hands inside his pockets the entire time she spoke with him, *id.* at 7, 23, 25.

k.  Regarding Officer Sheppard:

- He had problems with orientation and response time to calls including constantly not knowing what direction he was traveling in and passing addresses/locations of calls without knowing he had done so, **Ex. 40,** Sheppard's End of Phase Reports, at 2, 4;
- He struggled with completing routine forms accurately and completely, "would spend an inordinate amount of time" writing his reports and "showed great deficiency regarding the amount of time he needed to complete the most basic reports" during Phase 4, would leave out pertinent information and detail in reports such as "who, what, why, where, when, and how the crime took place," and had spelling and grammar errors that "actually change[d] the meaning of what had occurred," *id.* at 2, 4-6, 10, 16, 20, 24-25;
- He completed an assault report in which he did not include "anything that was told to him by the victim," *id.* at 20;
- He struggled with interviewing and investigation including not obtaining and recording all the necessary information and details he needed when interviewing someone which sometimes resulted in not having important details necessary for the charge or the prosecution of the crime, *id.* at 6, 10, 16; and
- He had issues with officer safety and among other things "made several contacts and non-custodial arrests without completing a pat down search of suspects," which occasionally resulted in him missing that the suspect had items like "nail clippers," "a 9 mm round," and a "folding knife," *id.* at 6-7, 11, 16-17, 27

l.   Regarding Officer Davis:

- He had difficulty with orientation and response time to calls, including being unable to find the locations of calls, having no idea where he was or where he was going, and driving in the opposite direction of the call, **Ex. 41,** Davis's End of Phase Reports, at 2, 7, 11-12;
- He took too long (an "exorbitant amount of time") writing his reports and on occasion left out facts and information in reports and routine forms, *id.* at 8, 21; and
- He had issues with officer safety including making many mistakes during his searches and processing of suspects and possible suspects and being unaware of his surroundings and potential dangers, *id.* at 8, 12-13, 27.

Thus, as shown from these other recruits' struggles during FTO, many had very similar performance problems as Officer Nguyen, including report writing, orientation, and officer safety issues, yet not one of them was terminated from the program.

29.   The other recruits' reports also make clear that report writing, despite how Defendant has attempted to portray it, is not of supreme importance in determining the future of a recruit. For instance, a training officer wrote that he explained to one of his trainees: "Officer Safety is paramount and . . . report writing will not necessarily get [someone] killed. . . . [R]eport writing is something that . . . continually improve[s] with time and experience." **Ex. 32,** Yballa's End of Phase Reports, at 10; *see also* **Ex. 35,** Ross's End of Phase Reports, at 17 ("[T]here is a limited amount of Remedial Efforts to correct [a] weakness [in Routine Forms: Appropriate Time Used]," and "[f]or the most part, it will simply be remedied through exposure and experience, which [the officer] will just have to encounter as he progresses in his first year as a police officer."); **Ex. 40,** Shepperd's End of Phase Reports, at 25 (Although the recruit was recommended to advance to a solo patrol capacity, "[s]pecial attention needs to be paid to correcting his reports before they are turned in for approval and closely checked by a supervisor."). Officer Nguyen's supervisors confirmed in their deposition testimony that report

writing and orientation are learned skills that improve with time, and report writing is not as important as officer safety. *See* **Ex. 9,** Quinones Dep. 35:5-25; **Ex. 28,** Ford Dep. 34:10-12; **Ex. 6,** Heimbigner Dep. 16:2-14, 33:21-34:9.

30.     While, nevertheless, Defendant in its Motion for Summary Judgment has used Officer Nguyen's struggles with report writing and orientation as a main justification for why his termination did not violate the ADA, Defendant did not make any argument that Officer Nguyen's termination did not violate the ADA because he is not disabled. Its failure to do so is notable not only because of its determination immediately before firing Officer Nguyen that he was not disabled and thus it did not have to provide him any reasonable accommodation, but also because this was one of its main defenses in the EEOC proceedings. *See* **Ex. 42,** Defendant's EEOC Position Statement, at 6. In its Answer in this litigation, on the other hand, Defendant admitted the allegations of the Complaint that stated Officer Nguyen "is an individual with a disability within the meaning of all applicable statutes, including Section 504 of the Rehabilitation Act . . . and the [ADA]." **Ex. 43,** Defendant's Answer, at 3. But then, in other sections of the Answer, Defendant stated it has "insufficient information to admit or deny the allegations" of the Complaint that allege Officer Nguyen was a qualified individual with a disability because, according to Defendant, Officer Nguyen's "physician stated . . . on the [RAQ] that [Officer Nguyen] did not have any major life activities that were substantially limited by his hearing." *Id.* at 15, 18.

31.     The EEOC, however, was not persuaded by Defendant's argument that Officer Nguyen is not disabled and found that "there is reasonable cause to believe there [was] a violation of the ADA in that [Defendant] denied [Officer Nguyen] a reasonable accommodation and discharged [him]." **Ex. 44,** EEOC Cause Finding, at 1. The EEOC emphasized that

Defendant denied Officer Nguyen the reasonable accommodation recommended by Dr. Feehs in the RAQ and terminated him because of performance deficiencies, some of which were related to his hearing. *Id.* at 3.

## IV.   STANDARD OF REVIEW

Summary judgment is only proper if the moving party shows both that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). This Court must view all evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Jacobsen*, 2012 U.S. Dist. LEXIS 25019, at *5 (Babcock, J.). If "a reasonable jury could return a verdict" for the nonmoving party, summary judgment must not enter. *Id.* "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984).

## V.   ARGUMENT

To establish a *prima facie* case of discrimination under Title I of the ADA, a plaintiff must show: (1) he is disabled within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) he was discriminated against because of his disability. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1250, 1266 (10th Cir. 2015).[7] Because disputed factual issues exist as to whether

---

[7] With one exception, Plaintiff agrees with Defendant that decisions under both the ADA and Rehabilitation Act apply to this case interchangeably. *See* **Def.'s Mot. Summ. J.** 12 n.5. However, while the Rehabilitation Act requires a plaintiff to prove he was discriminated against "solely" because of his disability to obtain relief, courts do not interpret the ADA to impose a "sole-cause liability scheme." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1074-77 (11th Cir. 1996) (determining that the Rehabilitation Act's "sole-cause liability" requirement does not apply to the ADA and explaining that the 10th Circuit has not addressed the issue). Rather,

Officer Nguyen is a qualified individual and whether Defendant discriminated against him by unlawfully failing to provide him a reasonable accommodation and terminating him because of his disability, Officer Nguyen's ADA and Rehabilitation Act discrimination claims may not be summarily judged.[8]

## A. OFFICER NGUYEN IS A DISABLED INDIVIDUAL UNDER THE AMERICANS WITH DISABILITIES ACT.

Congress amended the ADA in 2008 "to make it easier for people with disabilities to obtain protection under the [Act]," 29 C.F.R. § 1630.1(c)(4), and thus "[t]he definition of disability in [the ADA must] be construed in favor of broad coverage," 42 U.S.C. §12102(4)(A). Whether an individual "meets the definition of disability . . . should not demand extensive analysis," as "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred,"29 C.F.R. § 1630.1(c)(4).

---

courts have held that the ADA requires a plaintiff to show merely that the plaintiff's disability made "the difference in the employer's decision" ("but-for" cause), *id.* at 1077, or that it "played a motivating role" in the decision, *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336-38 (2d Cir. 2000); *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *Spychalsky v. Sullivan*, 2003 U.S. Dist. LEXIS 15704, at *19 (E.D.N.Y. Aug. 29, 2003). Because, as shown throughout this Response, there are disputed issues of material fact regarding whether Defendant fired Officer Nguyen "solely" because of his disability, summary judgment may not be granted on either his Rehabilitation Act claim or his ADA claim.

[8] Defendant repeatedly contends that Officer Nguyen cannot "prove," "establish," or "show" elements of his claims. *See, e.g.*, **Defs.' Mot. Summ. J.**, 15-16, 29. But Officer Nguyen is not required to "prove" the elements of his claims at the summary judgment stage; rather, he must establish only that genuine issues of material fact remain, and that a reasonable jury could infer from the disputed facts that he is able to prove his claims. *See Carr v. Castle*, 337 F.3d 1221, 1229 n.9 (10th Cir. 2003) ("In the summary judgment context, of course, [the plaintiff's] burden is only that of creating reasonable inferences, not one of proof as such."). Whenever this Response employs such terms, it should be understood as denoting this "lesser burden of creating reasonable inferences, not the actual burden of persuasion." *Id.*

The ADA defines "disability" as, among other things, "[a] physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include . . . hearing," 42 U.S.C. § 12102(2)(A), and "[a]n impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability," 42 U.S.C. § 12102(4)(B). Critically, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . hearing aids." 42 U.S.C. § 12102(4)(E)(i)(I).

The EEOC has added to these legislative mandates that consistent with the ADA's focus on whether employers have complied with their obligations and whether discrimination has occurred, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii). "[A]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limited." 29 C.F.R. § 1630.2(j)(1)(ii). Usually, comparing the individual's ability to perform a major life activity to that of most people in the general population "will not require . . . medical . . . analysis." 29 C.F.R § 1630.2(j)(1)(v).

Properly applying these definitions and rules of construction, it is impossible to dispute that Officer Nguyen is disabled. Without hearing aids, his ability to hear—a major life activity in itself—is substantially limited as compared to most people in the general population. *See, e.g.*, RSUMF, ¶¶ 1, 44; SADMF, ¶¶ 4-5, 19. The more difficult question is why, even just considering Officer Nguyen's pre-employment hearing evaluation and Pre-Employment Medical Agreement

and the anecdotal evidence of his hearing issues that was provided by his training officers during FTO, Defendant needed a doctor to make the *legal* determination that Officer Nguyen was disabled? *See* RSUMF, ¶¶ 22, 27, 30, 33, SADMF, ¶¶ 8-9, 12-13. Likewise, it is difficult to understand why Defendant relied exclusively on Dr. Feehs' RAQ answers to conclude that Officer Nguyen was *not* disabled, given that those answers were internally inconsistent, never clarified by Ms. Springer or any other employee of Defendant, and entirely contradicted the comprehensive records Defendant had amassed during FTO showing that Officer Nguyen's hearing loss was a disability under the ADA—including the observations of Sergeant Heimbigner in his termination recommendation letter that Officer Nguyen's hearing impairment would be a major concern if his training were allowed to continue. *See id.*; *see also* RSUMF, ¶ 41, SADMF, ¶¶ 19-20. The absurdity of concluding that Officer Nguyen did not have a hearing disability while at the same time terminating him due, at least in very substantial part, to performance difficulties that were related to his hearing impairment raises a disputed factual issues whether Defendant participated in the Interactive Process in good faith (discussed below, *see* § V.B.2.b), or instead conveniently used Dr. Feehs' plainly ADA-ignorant responses to the RAQ to avoid providing Officer Nguyen a reasonable accommodation and proceed with his termination despite knowing he was disabled.

The authority Defendant cites to support its argument that it was entitled to rely on Dr. Feehs' assertion that Officer Nguyen was not disabled (though, as discussed above at RSUMF ¶ 36, Dr. Feehs never actually made such an assertion), *see* **Def.'s Mot. Summ. J.** 27-28, is inapplicable to this determination. For instance, in *Bailey v. City of Englewood*, No. 13-cv-01715-RM-NYW, 2015 U.S. Dist. LEXIS 89847, at *25-26 (D. Colo. July 10, 2015), the plaintiff never gave to his medical provider a letter from defendant seeking information relating

to his disability and what limitations the plaintiff's condition imposed on his work, nor did the plaintiff provide the defendant with any medical evaluations. "The record [was] thus devoid of objective medical evidence that [the plaintiff] had any restrictions on his ability to work due to his disabilities." *Id.* at *26. The same facts were present in *Turner v. City & Cty. of Denver*, No. 10-cv-00583-PAB-KMT, 201 U.S. Dist. LEXIS 45419, at *3, 9-10 (D. Colo. 27, 2011), in which the plaintiff never provided the defendant any medical information regarding his condition (including failing to return to the defendant a completed RAQ). *See also Templeton v. Neodata Servs.*, 162 F.3d 617, 618-19 (plaintiff refused to provide medical information regarding her ability to work in response to a reasonable request for such from her employer).

Here, however, Officer Nguyen provided Defendant with the completed RAQ, which was in addition to the pre-employment medical evaluation information Defendant already had regarding his hearing impairment. *See* SADMF, ¶¶ 4-5. As the Third Circuit explained in a similar situation, "if the note [from the plaintiff's doctor] was too ambiguous and [the employer] did not know what [reasonable accommodation the plaintiff] wanted, [the employer] easily could have called [the doctor] for a clarification." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (citation omitted). Indeed, DPD's ADA policy provides authority to Defendant to obtain information regarding an officer's medical condition beyond that which is submitted in the RAQ: "In making the determination that an officer has a disability . . . and any resulting limitations, [Defendant] . . . may request and review medical records and other documentation in the possession, custody, or control of the officer . . . or his/her health care providers." **Ex. 12,** DPD ADA Policy, at 2. Officer Nguyen's Pre-Employment Medical Agreement also provided explicit authorization for Defendant to obtain, "upon request, . . . full access to the medical records related to his hearing condition." **Ex. 23,** Pre-Employment Medical Agreement and

Evaluation, at 4. Under these circumstances, it is incorrect to conclude that Officer Nguyen "fail[ed] to provide medical information necessary to the interactive process" and thus is "preclude[d] . . . from claiming that [Defendant] violated the ADA." *Bailey*, 2015 U.S. Dist. LEXIS 89847, at *25-27.

Moreover, even assuming Officer Nguyen told Ms. Springer he agreed with Dr. Feehs' responses (and Officer Nguyen disputes that he did so, *see* RSUMF ¶ 39), Defendant's attempt to therefore place the failure of the IAP on him for not disputing the RAQ responses is inconsistent with the law and common sense. The law "squarely place[s] some of the burden" of the IAP on the employer. *Taylor*, 184 F.3d at 315. Relying entirely on Officer Nguyen, who may have no familiarity with the law or the ADA, to refute Dr. Feehs' responses places the burden entirely on him and lets Defendant "simply sit back passively" and do nothing, even in the face of the absurd result arrived at in this case. *Id.* As shown by the fact that Defendant's ADA coordinator herself did not know how to apply the definition of "disability" and thought the determination was "complicated," the contention that Defendant is excused from all liability because Officer Nguyen "had no argument that [the RAQ] should be anything different," SADMF, ¶ 21, does not comport with "interactive dialogue" envisioned by the ADA, *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999).

Accordingly, Officer Nguyen is an individual with a disability under the ADA and Rehabilitation Act, and a jury might well believe that Defendant's conclusion otherwise during the IAP violated its obligation to participate in the IAP in good faith participation. *See id.*

**B. OFFICER NGUYEN WAS QUALIFIED WITH A REASONABLE ACCOMMODATION TO PERFORM THE ESSENTIAL FUNCTIONS OF DPD POLICE OFFICER.**

A two-part analysis determines whether an individual is qualified to perform the essential functions of his job, with or without a reasonable accommodation. *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995). First, the court must ask whether the plaintiff could perform the essential functions of the job. *Id.* "Second, if (but only if) [the court] conclude[s] that the individual is not able to perform the essential functions of the job, [it] must determine whether any reasonable accommodation by the employer would enable him to perform those functions." *Id.* at 361-62. This determination is a mixed question of law and fact. *Mason v. Avaya Communs., Inc.* 357 F.3d 1114, 1122 (10th Cir. 2004).

Officer Nguyen does not contend that he was able to perform the job without a reasonable accommodation; however, the facts demonstrate at least a triable issue of fact as to whether he could perform the essential functions of his job *with* a reasonable accommodation. "[S]ummary adjudication may be improper when the employee has presented evidence []he could perform the essential functions of [his] position with the aid of an accommodation." *Osborne*, 798 F.3d at 1266 (citation omitted).

**1. Officer Nguyen has established that he is able to perform the essential functions of the job of DPD police officer with a reasonable accommodation.**

**a. Essential Job Functions**

One of "[t]he most critical function[s] of the jury in ADA cases . . . [is] the injection of some indispensable common sense in the determination of what is or is not an essential function." *Masterson v. Yellow Freight Sys.*, Nos. 98-6025 & 98-6126, 1998 U.S. App. LEXIS 31152, at *7 (10th Cir. Dec. 11, 1998) (citation omitted). Essential functions are "the fundamental job duties of the employment the individual with a disability holds or desires," and

not those that bear just a marginal relationship to the job at issue. 29 C.F.R. § 1630.2(n)(1). In

determining whether a job duty is an essential function, courts may look at "[t]he employer's

judgment as to which functions are essential," "[w]ritten job descriptions," "[t]he amount of time

on the job performing the function," "[t]he consequences of not requiring the incumbent to

perform the function," "[t]he work experience of past incumbents in the job," and/or "[t]he

current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

Defendant appears to believe that every item listed in its job description for police officer

is an "essential function." *See* **Def.'s Mot. Summ. J.** 3. But "an employer may not turn every

condition of employment which it elects to adopt into a job function, let alone an essential job

function, merely by including it in a job description." *Rohr v. Salt River Project Agric.*

*Improvement & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009) (citation omitted). By its own

description, many of those items constitute "Physical Requirements" and "Required Knowledge,

Skills, Abilities, and Other Characteristics." **Def.'s Mot. Summ. J.**, **Ex. 2**, at 2-3, 8-11. Skill,

experience, education, and other job-related requirements are a perquisite to performing the

essential functions of a position, but they are not themselves essential functions. *See Jacobsen*,

2012 U.S. LEXIS 25019, at *8 (Babcock, J.). "Whether a plaintiff possesses the prerequisite job

requirements cannot include that he or she will be able to successfully perform that position." *Id.*

at *9. Rather, the question whether an individual is a qualified individual with a disability

"centers on whether the plaintiff's *disability*, with or without a reasonable accommodation,

prevents [him] from performing the essential functions of a position." *Aquart v. Ascension*

*Health Info. Servs.*, No. A-09-CA-804-AWA, 2011 U.S. Dist. LEXIS 6509, at *24 (W.D. Tex.

Jan. 24, 2011). Indeed, "[i]f poor performance were enough to demonstrate an employee was not

'qualified' under the ADA, then . . . a court would never need to reach the question of whether

the performance deficiencies were the reason for termination, since the performance problems would render the plaintiff 'unqualified.'" *Id.* at *25.

Thus, while "*[g]enerally . . . courts do not otherwise second-guess [an] employer's judgment in describing the essential requirements of the job*" *Robert v. Carter*, 819 F. Supp. 2d 832, 842 (S.D. Ind. 2011) (emphasis added) (citation omitted), Defendant's argument that Officer Nguyen's performance difficulties unrelated to his hearing disability means he is not a qualified individual must fail. *See* **Def.'s Mot. Summ. J.** 15. The performance problems of other recruits in Officer Nguyen's class—the work experience of incumbents in the job, 29 C.F.R. § 1630.2(n)(3)—also undermines this argument. If the ability to write somewhat accurate and complete reports in a reasonable amount of time and determine the fastest route to a call were "essential functions" of the position of DPD police officer, then more than a few of Officer Nguyen's classmates would not be "qualified individuals" either. *See* SADMF, ¶ 28.a, b, c, d, e, f, g, h, i, k, l; *see also id.* at ¶ 29 (statements by employees of Defendant that report writing and orientation improve with time and are not as critical as officer safety). Defendant's fourteen-page job description consequently should not exclusively determine what job duties are "essential functions" of the position.

Regarding whether Officer Nguyen's hearing disability, with or without a reasonable accommodation, prevented from performing the essential functions of the position, *see Aquart*, 2011 U.S. Dist. LEXIS 6509, at *24, Defendant's arguments are flawed for two reasons. First, Officer Nguyen concedes that he needed a reasonable accommodation, which Defendant did not provide, to perform the essential functions of the job. Defendant's list of Officer Nguyen's hearing-related performance failures occurred *without* his having reasonable accommodations. *See* **Def.'s Mot. Summ. J.** 13-14. Because, as discussed in the next subsection, *see* § V.B.1.b,

Officer Nguyen's use of the new hearing aids and the FreeLinc at LSPD allow him to successfully perform his job of LSPD police officer, for this reason among others he has at least raised a disputed issue of fact whether he could have performed the essential functions of a DPD police officer with such accommodations.

Second, contrary to Defendant's argument, an employer may not merely cry "danger" and thereby establish that the safety implications of an employee's disability disqualify him from performing the essential functions of the job. Rather, to so disqualify the employee, the employer must show that the employee "pose[s] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113. Such a requirement applies to all covered employers under the ADA; there is no exception for positions that by their very nature implicate health and safety. *See Osborne*, 798 F.3d at 1269. "When the essential functions of a position implicate health and safety, courts consider [direct threat] criteria to determine whether an employee is qualified for purposes of the second element of the *prima facie* case." *Id.*

"Direct threat means *a significant risk of substantial harm* to the health or safety of the [employee] or others that cannot be eliminated be reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (emphasis added). In this context, a significant risk means a "high probability" of substantial harm: "[a]n employer . . . is not permitted to deny an employment opportunity to an individual merely because of a slightly increased risk." 29 C.F.R. Part 1630 Appendix. "The [employee] is not required to prove that he . . . poses no risk." *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 432 (6h Cir. 1999). Thus, "[a] speculative or remote risk is insufficient" to establish a direct threat, and consideration whether an individual with a disability would pose a direct threat "must rely on objective, factual evidence—not on subjective

perceptions, irrational fears, patronizing attitudes, or stereotypes—about the nature or effect of a particular disability." 29 C.F.R. Part 1630 Appendix.

"The determination whether an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safety perform the essential functions of the job," considering "[t]he duration of the risk," "[t]he nature and severity of the potential harm," "[t]he likelihood that the potential harm will occur," and "[t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r). Defendant did not (and cannot) point to any past substantial harm caused by Officer Nguyen's hearing disability. Indeed, Defendant's statement that "[t]he potential harms caused by a police officer's inability to hear are myriad and far from speculative," **Def.'s Mot. Summ. J.** 14-15, is not based on "an individualized assessment" of Officer Nguyen's ability to perform the job but rather fears and stereotypes about the nature or effect of a hearing disability, which is an expressly prohibited basis to disqualify an employee from a job, *see* 29 C.F.R. Part 1630 Appendix. Additionally, the issue is not Officer Nguyen's past ability to safely perform the job *without* a reasonable accommodation, but his present ability to do so, which depends on whether "a proposed accommodation satisfies health and safety concerns" by "eliminat[ing] a significant [safety] risk." *Osborne*, 798 F.3d at 1269. It is unlikely this determination can be made at the summary judgment stage:

> Whether one is a direct threat is a complicated fact intensive determination, not a question of law. To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm. . .. *Permitting employers to obtain summary judgment by identifying . . . unlikely scenarios would eliminate ADA protection for disabled individuals working in professions where they might be tasked with the health and safety of others.*

*Id.* at 1278 (emphasis added) (internal citation omitted).

Because Defendant has pointed to nothing in the record that shows, as to any given risk of harm caused by Officer Nguyen's hearing impairment, the duration of the risk, or the nature, severity, likelihood, or imminence of the harm, it has not established that no genuine dispute of fact exists regarding whether Officer Nguyen, with a reasonable accommodation, is a "direct threat" to the health and safety of others. *See* 29 C.F.R. § 1630.2(r); *see also Osborne*, 798 F.3d at 1278 (holding that the defendant did not establish that the plaintiff was a direct threat in part because nothing in the record established whether or how often the potential risks the defendant identified would occur). Conversely, as shown in the next section, such disputed issues of fact *do* exist regarding whether Officer Nguyen can safety perform the job of DPD police officer with a reasonable accommodation.

Moreover, Defendant does not cite any evidence regarding the abilities of its non-disabled officers to safely perform the type of duties that it contends Officer Nguyen will perform unsafely. *Cf. Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 764 (5th Cir. 1996) (holding there was a genuine issue of material fact as to whether the plaintiff was a direct threat and stating no evidence was presented regarding the ability of a non-disabled individual in the same position to perform the identified duty safely). "Like any other qualification standards," under the ADA, the requirement that an individual not pose a direct threat "must apply to all applicants or employees and not just to individuals with disabilities." 29 C.F.R. Part 1630 Appendix. Given the extensive records showing that other, non-hearing-disabled recruits from Officer Nguyen's class also had, according to Defendant's own employees (the recruits' training officers), performance issues that posed serious safety risks, Defendant has not shown that Officer Nguyen's disability allegedly posing a safety hazard was the reason for his termination, rather than discrimination. *See* SADMF, ¶ 28.a, b, e, g, h, i, j, k, l.

The cases cited by Defendant are either inapposite or distinguishable. *Kokkinis v. Ivokovich*, 185 F.3d 840, 845-46 (7th Cir. 1999), addresses employer regulation of employee speech under the First Amendment, and thus has no applicability in the ADA context. *Fraterrigo v. Akal Security, Inc.*, 2008 U.S. Dist. LEXIS 87451, at *5, *27-29 (S.D.N.Y. Oct 29, 2008), involved a court security officer job that required the employee to meet certain hearing standards set by the United States Marshal Service *without* wearing hearing aids; the court held that such a requirement was permissible because it was "job-related and consistent with business necessity." In *Robert*, 819 F. Supp. 2d at 842-44, the issue was whether using a Taser was an essential job function for a civil deputy process server when the plaintiff's disability prevented him from being able to let himself be tased during training. There is no such essential job function of DPD police officer, however, that Officer Nguyen cannot perform with a reasonable accommodation. This fact also distinguishes *Karbusicky v. City of Park Ridge*, 950 F. Supp. 878, 879-85 (N.D. Ill. 1997), in which the plaintiff's hearing loss was not sufficiently improved with hearing aids (although notably, the defendant police department let the plaintiff obtain and use a new hearing aid for a period of time before firing him because it did not improve his hearing performance). Unlike the plaintiff in *Karbusicky*, *id.* at 881-82, 884, based on the statements of Officer Nguyen's audiologist, his expert witness, his LSPD supervisors, and Officer Nguyen himself, Officer Nguyen's hearing with his new hearing aids and the Bluetooth allows him to perform the essential functions of the job of police officer, *see* RSUMF, ¶ 43; SADMF, ¶¶ 23-26.[9]

---

[9] For this reason—that Officer Nguyen at the very least has shown a disputed issue of fact regarding his ability with a reasonable accommodation to safely perform the job of DPD police officer—the other cases cited by Defendant are likewise distinguishable. *See Leverett v. City of Indianapolis*, 51 F. Supp. 2d 949, 957-58 (S.D. Ind. 1999) (holding a firefighter did not show he was qualified because he could not establish that a hearing aid would allow him to meet the objective hearing standards for the job); *Collis v. Gwinnett Cty.*, 156 F. Supp. 2d 1342, 1344-50 (N.D. Ga. 2001) (holding that a paramedic's failure due to hearing loss to alert and react to

### b. Reasonable Accommodations

"A reasonable accommodation is one that presently, or in the near future, enable[s] the employee to perform the essential functions of his job." *Punt v. Kelly Servs.*, No. 14-cv-02560-CMA-MJW, 2016 U.S. Dist. LEXIS 1018, at *28 (D. Colo. Jan. 6, 2016) (citation omitted). On summary judgment, the employee "must first demonstrate that an accommodation appears reasonable on its face." *Jacobsen*, 2012 U.S. Dist. LEXIS 25019, at 13 (citation omitted). A proposed accommodation "seems reasonable on its face" if it would be reasonable "ordinarily or in the run of cases." *Osborne*, 798 F.3d at 1267. Conversely, "a proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Id.* The burden then "shifts to the employer to present evidence of its inability to accommodate" by "show[ing] special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* (citation omitted). If the employer does so, the employee must come forward "with evidence concerning [his] individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Id.* at 1268. "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Id.* at 1267 (citation omitted).

For three reasons, Officer Nguyen can clearly show that his proposed accommodation consisting of DPD allowing him to obtain new hearing aids (the ones he wears now) and use the FreeLinc is reasonable on its face. First, regarding his new hearing aids, both he and Dr. Huerta testified that they improved his hearing. Indeed, Dr. Huerta testified that "odds" were that

---

emergency radio and direct communications meant he was not qualified for the job—but also notable because the defendant purchased new hearing aids for the employee and extended his probationary period to evaluate his hearing with the aids before terminating him because his hearing performance had not improved).

Officer Nguyen had close to normal hearing with the new hearing aids and she provided specific testimony regarding how the new aids improved his ability to hear, such as by helping him distinguish radio calls from background noise or hear softer sounds like someone walking up behind him. RSUMF, ¶ 43; SADMF, ¶ 25. Officer Nguyen testified that his new hearing aids are better than the ones he had when working at DPD and transmit sound better, louder, and clearer. SADMF, ¶ 24. Second, Officer Nguyen's expert and supervisors at LSPD attest that he can perform the essential functions of the job of police officer. *See* SADMF, ¶¶ 23. 26. Mr. Montgomery expressly stated that when observing Officer Nguyen's performance as a LSPD officer in March 2017, which was when Officer Nguyen was wearing the new hearing aids, he did not notice any problems with his hearing even when Mr. Montgomery intentionally spoke softly or from behind him. SADMF, ¶ 26. Lastly, Dr. Feehs testified that when he saw Officer Nguyen in March 2014 for the RAQ, based on what Officer Nguyen was reporting about his hearing, "stronger hearing aids could have improved his hearing" and thus "he may have need[ed] new hearing aids, stronger hearing aids," which is consistent with Dr. Feehs recommendation in the RAQ that Officer Nguyen try newer, stronger hearing aids. **Ex. 11**, Feehs Dep. 57:1-3, 75:13-25; *see also* SADMF, ¶ 19.

Therefore, the new, stronger hearing aids were an accommodation that would enable and in fact did enable Officer Nguyen to perform the essential function at issue—hearing sounds that are necessary for a police officer to hear—on the particular facts of the case, and, also, stronger hearing aids are obviously a reasonable proposed accommodation "ordinarily or in the run of cases" of individuals with hearing loss. *Osborne*, 798 F.3d at 1267. Defendant's arguments to the contrary are unavailing.

As an initial matter, Defendant's arguments regarding speculation and lack of specificity rely on an incorrect understanding of the law. *See* **Def.'s Mot. Summ. J.** 25. The requirement that the plaintiff identify a reasonable accommodation to meet its burden during litigation is just that: a litigation burden. An employee need not "come forward with a reasonable accommodation that would prevail in litigation" during or before the interactive process. *Taylor*, 184 F.3d at 317; *see also Floyd v. Lee*, 85 F. Supp. 3d 482, 513 n.46 (D.D.C. 2015); *McQuillan v. Petco Animal Supplies Stores*, Inc., No. 13-5773 (FLW), 2014 U.S. Dist. LEXIS 58464, at *20 (D.N.J. Apr. 28, 2014); *Niemczura v. Coral Graphics Servs.*, No. CV 04-5452 (TCP)(MLO), 2005 U.S. Dist. LEXIS 30367, at *14 (E.D.N.Y. Nov. 15, 2005). Indeed, the whole purpose of the interactive purpose is to determine appropriate accommodation. *Taylor*, 184 F.3d at 316.

Officer Nguyen can meet his burden to show a reasonable accommodation by establishing *now* that there was a specific accommodation available at the time he was terminated that would have enabled him to perform the essential functions of the job and he thus could have been reasonably accommodated but for the employer's lack of good faith in the IAP. *Id.* at 320. The specific hearing aids that Dr. Huerta ordered for Officer Nguyen on April 2, 2014—twenty-one days before he was fired—and that he has been wearing since May 7, 2014, existed when he was terminated. *See* RSUMF, ¶ 42; *see also* **Ex. 4,** Huerta Records – Hearing Aid Order and Re-Make. Defendant's cited cases in which the court held that the plaintiff did not meet his or her burden of production on this element because he or she did not identify any specific accommodation *during litigation* or the plaintiff did not show that a proposed accommodation actually existed thus do not apply here. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d. Cir. 2000); *Spraggs v. Sun Oil Co.*, No. 97-5194, 2000 U.S. App. LEXIS

10694, at *9 (10th Cir. May 16, 2000); *White v. York Int'l Corp.*, 45 F.3d 357, 362-63 (10th Cir. 1995).[10]

Moreover, there is no requirement—and Defendant cites no case that stands for a requirement—that Officer Nguyen demonstrate that the new hearing aids would have allowed him to perform the essential functions of the job of DPD police officer by pointing to objective tests that quantify their effectiveness. *See* **Def.'s Mot. Summ. J.** 25-26.[11] As discussed above, *see* § V.B.1.a, Officer Nguyen need not 100% guarantee that he can safely perform the job with the new hearing aids to establish he is a qualified individual. Rather, the evidence from Officer Nguyen, Dr. Huerta, Mr. Montgomery, and Officer Nguyen's LSPD supervisors sufficiently shows for purposes of surviving summary judgment that there are disputed issues of fact whether he can perform the essential functions of the job with the new hearing aids. Indeed, the Southern District Court of New York reached the same conclusion on very similar facts in *Phillips v. City of New York*, No. 1:11-cv-06685-KPF (Sep. 24, 2014), **Ex. 45**. The court held that despite the New York Police Department's policy that uniform members of the force could not wear hearing

---

[10] Defendant also seems to think that the determination whether a reasonable accommodation existed should be made by relying entirely on the RAQ (which, of course, is consistent with its actual practice of relying exclusively on the RAQ during the IAP). However, given that the IAP requires that the employer "make a *reasonable effort* to explore the accommodation possibilities with the employee," *Jacobsen*, 2012 U.S. Dist. LEXIS 24019, at *29 (Babcock, J.) (emphasis added), Defendant was not discharged from its obligation to work with Officer Nguyen to identify a reasonable obligation merely because Dr. Feehs recommended "new stronger, hearing aids" without specifying which ones.

[11] *Leverett*, 51 F. Supp. at 953, did not hold that the plaintiff needed to show through objective testing that he was a qualified individual; indeed, the court in *Leverett* stated that "there [was] no widely accepted standard or test with which to measure an individual's ability to localize sound." Regardless, the tests that the experts did administer to the plaintiff in *Leverett* showed that he was unable to localize sound, which was an essential function of his job as a firefighter, and, unlike the evidence Officer Nguyen has put forth showing that the new hearing aids do improve his job-related hearing ability, the "evidence adduced at trial [did] not support [the plaintiff's] belief that [a certain hearing aid] would [have] improve[d] his ability to localize sound." *Id.* at 954-57. Notably, *Leverett* was decided after a bench trial, not on summary judgment.

aids, the plaintiffs had established a disputed issue of material fact whether they could perform the essential functions of their jobs while wearing hearing aids by presenting testimony from audiologists, their supervisors, and the plaintiffs themselves. *Id.* at 4, 13-17. The court in *Phillips*, *id.* at 16, also discussed one of the cases on which Defendant relies, *Fraterrigo*, 2008 U.S. Dist. LEXIS 87451, and noted that since the ruling in that case, the USMS had "amended its medical standards to permit the use of hearing aids by court security officers."

For the same reasons, Defendant has not demonstrated it would have suffered undue hardship, *see Osborne*, 798 F.3d at 1267, had it not terminated Officer Nguyen but rather let him return to the FTO program after he obtained the new hearing aids. The so-called safety concern Defendant cites to support its argument that doing so was justified—that to satisfy its ADA obligations Defendant did not need to "throw[] caution to the wind, cross[] [its] fingers, let [Officer Nguyen] loose on the streets of Denver . . . and hope[] that he could perform well enough not to get himself or others killed," **Def.'s Mot. Summ. J.**  26—is nothing more than the speculative "unlikely scenario[]" the Tenth Circuit has held should not allow an employer to obtain summary judgment, *Osborne*, 798 F.3d at 1278. And, contrary to Defendant's assertion, Officer Nguyen's returning to work as a DPD officer after obtaining the new hearing aids would not have constituted a "trial period" for him to establish that he was a qualified individual. *See* **Def.'s Mot. Summ. J.**  26. The evidence discussed above shows that Officer Nguyen is a qualified individual and this case is therefore distinguishable from *Buck v. Fries & Fries*, No. 95-3093, 1988 U.S. App. LEXIS 7074, at *12 (6th Cir. Apr. 3, 1998), in which the plaintiff had not otherwise established he was a qualified individual but argued that he should have been able to do so by demonstrating he could perform the essential functions of his job by returning to his job after an injury. The court explained that such was "simply not an accommodation under the

ADA, because it [did] not serve to enable [the plaintiff] to perform his job—it only help[ed] to determine whether [he was] capable of performing his assigned tasks." *Id.* at 13. Defendant's allowing Officer Nguyen to return to work after obtaining the new hearing aids, on the other hand, would not have been so he could show he was a qualified individual and therefore be entitled to a reasonable accommodation; it was, in conjunction with Defendant's providing him a FreeLinc, the reasonable accommodation in itself.

As Defendant's arguments regarding the FreeLinc, *see* **Def.'s Mot. Summ. J.** 20-21, they are almost all addressed by the simple fact, stated in the previous sentence, that *both* the FreeLinc and the new hearing aids *together* are the reasonable accommodation proposed, not *either* the FreeLinc *or* the new hearing aids. This common sense principle is explained by the EEOC in its Enforcement Guidance: "The duty to provide reasonable accommodation is an ongoing one. Certain individuals require only one reasonable accommodation, while others may need more than one." The U.S. Equal Employment Opportunity Comm'n, *Enforcement Guidance on Reasonable Accommodations Undue Hardship Under the Americans with Disabilities Act* (Oct. 27, 2002), *available at* https://www.eeoc.gov/policy/ docs/accommodation.html. Moreover, as in *Taylor*, 184 F.2d at 319, "the fact that [the] potential accommodations are modest should not encourage [this Court] to dismiss [the] claim on summary judgment on the theory that they would be useless; that would have the bizarre implication that the more demanding a plaintiff's accommodations were, the more likely the plaintiff is to survive summary judgment."[12]

---

[12] Defendant also argues that the FreeLinc was not a reasonable accommodation because it "would have provided no additional benefit" to Officer Nguyen because it would not have helped with his non-hearing related issues such as orientation and report writing. **Def.'s Mot. Summ. J.** 21. But this argument dispels itself. An accommodation for a disability addresses the issues caused by the disability; that any non-disability-related issues remain despite the accommodation

Accordingly, Officer Nguyen can establish (or at least show there are disputed factual issues) that he is qualified with the reasonable accommodation of a FreeLinc and his new hearing aids to perform the essential functions of the job of DPD officer.

### 2. Defendant had an obligation to provide Officer Nguyen with a reasonable accommodation.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . [and] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." 42 U.S.C. at § 12112(b)(5)(A); *see also* 29 C.F.R. §1630.9.[13] Because the purpose of the IAP is to determine a reasonable accommodation, *Taylor*, 184 F.3d at 316, if "an employer knows of a disability of a qualified individual, the employer has [an] obligation to participate in the interactive process of determining [the] accommodation," *United States v. City and Cty. of Denver*, 49 F. Supp. 2d at 1240.

Since Defendant knew that Officer Nguyen had a disability and needed a reasonable accommodation to perform the essential functions of his job, at the latest, when Corporal Ford submitted his End of Phase 1 Report, Defendant had an obligation to initiate the IAP at that time. Defendant's failure to do so, and its failure to participate in the IAP in good faith once it finally

---

is irrelevant to the effectiveness of the accommodation in accommodating the issues caused by the disability. *See* § V.A.

[13] The Rehabilitation Act also imposes a duty upon employers to make reasonable accommodations for disabled employees. *See Roberts v. Progressive Indep., Inc.*, 183 F.3d 1215, 1220, 1220 n.3 (10th Cir. 1999).

did initiate it, resulted in Defendant's not providing Officer Nguyen a reasonable

accommodation, in violation of the ADA.

### a.      Notice of a Disability and Triggering of the Interactive Process

### i.      Request for Accommodation is not Required

As DPD's own policy provides, its "duty to engage in the IAP is triggered" when it "has

actual or constructive notice that a police officer may have a disability for which that officer

needs a reasonable accommodation." SADMF, ¶ 10. Contrary to Defendant's argument that an

employer's duty to engage in the IAP is not triggered until an employee asks for a reasonable

accommodation, *see* **Def.'s Mot. Summ. J.** 17, DPD's ADA policy regarding when it must

initiate the IAP (which apparently it does not actually follow) is consistent with the ADA's

statutory language, its case law, and its legislative purpose.

First, the ADA requires employers to make "reasonable accommodations to the *known*

physical or mental limitations" of employees with disabilities. 42 U.S.C. § 12112(b)(5)(A)

(emphasis added). The statutory (and regulatory) language "speaks of accommodating 'known'

disabilities, not just disabilities for which accommodation has been requested." *Brady v. Wal-*

*Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). Based on this language, if an employer has

knowledge, regardless of whether that knowledge is from an employee's request for an

accommodation or otherwise, that the employee has a disability and needs a reasonable

accommodation, it is obligated to provide one. *See id.* (holding that "an employer has a duty to

reasonably accommodate an employee's disability if the disability is obvious—which is to say, if

the employer knew or reasonably should have known that the employee was disabled").

Thus, the EEOC guidelines, while explaining that an employer would not be "expected to

accommodate disabilities of which it is unaware," provide that "*[i]n general*, . . . it is the

responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. Part 1630 Appendix (emphasis added).[14] The "qualifying words 'in general'" mean that "[g]enerally it will be the employee's burden to initiate the [interactive] process—but not always." *Johnson v. Foulds, Inc.*, No. 96-2961, 1997 U.S. App. LEXIS 3386, at *7 (7th Cir. Feb. 19, 1997). Were the rule otherwise, employers who were aware a disabled employee needed a reasonable accommodation could sit back and do nothing until the employee's disability led to performance difficulties, then legitimately fire him for such difficulties on the premise that it did not have any obligation to provide an accommodation before such difficulties arose—which is exactly what happened here.

Not surprisingly, then, courts consistently interpret the ADA to require that reasonable accommodations be provided whenever there is notice that they are needed: "[i]t is well settled that a request for an accommodation is not required where the disabled individual's need for an accommodation is obvious." *Brown v. Cty. of Nassau*, 736 F. Supp. 2d 602, 618-19 (E.D.N.Y. 2010). For instance, the Tenth Circuit held in *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1189, 1196 (10th Cir. 2007), that even though a deaf inmate told the booking officer that "he had no physical or health problems," because "there [was] a question of fact as to the [jail's] knowledge" of the inmate's disability and his need for an accommodation, summary judgment was inappropriate.[15] The court held that "before a public entity can be required under the ADA to provide" a reasonable accommodation, "the entity must have knowledge that the

---

[14] The EEOC guidelines "constitute [t]he administrative interpretation of the [ADA] by the enforcing agency and consequently they are entitled to great deference." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975).

[15] Although *Robertson*, 500 F.3d at 1196, 1198, is a Title II ADA case, the court explicitly relied on Title I cases in reaching the relevant holding. It is therefore proper to look to *Robertson* for guidance here.

individual is disabled, either because *that disability is obvious* or because the individual (or someone else) has informed the entity of the disability." *Id.*at 1196 (emphasis added). "Once the public entity has knowledge of an individual's disability," it is required to provide an accommodation if it "also [has] knowledge that an individual requires [one]." *Id.* at 1197. Like with knowledge of the disability itself, an entity may have knowledge of the need for an accommodation because that need "is 'obvious.'" *Id.* Consequently, "**[w]hen a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim**." *Id.*

Numerous cases, including the one against Denver discussed in the Introduction, likewise hold that an employer must provide a reasonable accommodation to an employee (or at least initiate the IAP to determine if it is possible to provide an accommodation) when the employer knows that the employer is disabled and needs an accommodation, whether or not the employee has requested one. *See United States v. Denver*, 49 F. Supp. 2d at 1240-41 ("[I]f . . . an employer knows of [an employee's] disability . . ., the employer has an obligation to participate in the interactive process of determining an accommodation. . . . . An employer knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through third party or by observation. The employer need only know the underlying facts [the existence of a physical or mental impairment], not the legal significance of those facts [that such impairment is considered a disability]."); *accord Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) ("The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." (reversed on other grounds)); *Campbell v. Wal-Mart Stores*, 272 F. Supp. 2d 1276, 1287-90 (N.D. Okla. 2003)

(denying summary judgment to the employer which it sought on the ground that the employee did not ask for a reasonable accommodation when "[i]t [was] undisputed [the employee's] disabilities (i.e., deafness and legal blindness) were known to [the employer] at the time [she] commenced her employment," and "[i]n fact, [she] listed those disabilities on her application for employment and pre-screening questionnaire"); *see also McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *25-27 (S.D. Tex. Aug. 9, 2006) (listing cases).

Although Defendant cited cases from the Tenth Circuit that may appear inconsistent with the rule from *Robertson*—*see Koessel v. Sublette Cty. Sheriff's Dep't* 717 F.3d 736, 744-45 (10th Cir. 2013), *Dinse v. Carlisle Foodservice Prods.*, 541 F. App'x 885, 889-93 (10th Cir. 2013)— a panel of the Tenth Circuit "cannot overrule the judgment of another panel of [the] court," as it is "bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *Haynes v. Kansas*, 261 F. App'x 87, 89 (10th Cir. 2008). Instead of assuming that *Koessel and Dinse* (impermissibly) overruled *Robertson sub silentio* or intended *sub silentio* to distinguish between Title I and Title II ADA cases (despite *Robertson*'s explicit reliance on Title I cases, *see supra* note 15), it is possible to harmonize the general requirement that a disabled employee request a reasonable accommodation before an employer's obligation to initiate the IAP is triggered with an exception to this rule when the employee's disability and need for a reasonable accommodation are obvious. "[T]here is a balance to be struck between a disabled individual's need to request accommodations when limitations are not obvious or apparent and [an ADA covered entity's] duty to provide accommodations without further notice or a request." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012). While "[t]he notice requirement is rooted in common sense" because "obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have

discriminated based on that disability," this "concern[] [is] not relevant when an employer has independent knowledge of an employee's disability." *Brady,* 531 F.3d at 135 (citation omitted).[16]

Furthermore, letting an employer avoid its obligation to provide a reasonable accommodation to an employee who has an obvious disability and need for accommodation on the mere technicality that the employee did not request an accommodation is inconsistent with the purpose of the 2008 amendments to the ADA, which were "to make it easier for people with disabilities to obtain protection under the ADA" and which make clear that "the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their [ADA] obligations." 29 C.F.R. § 1630.1(c)(4). Contrary to this explicit purpose, an intent focus on whether there was a request for an accommodation—like the intent focus on whether someone was disabled that had developed in the case law Congress overruled with the 2008 amendments—decreases coverage under the Act and takes attention away from the employer's obligations. *See* ADA Amendments Act of 2008, 110 P.L. 325, 122 Stat. 3553, § 2 (purpose of 2008 Amendments).

Defendant thus was obligated to initiate the IAP, regardless of whether Officer Nguyen expressly requested an accommodation. Based on Officer Nguyen's pre-employment medical evaluation and Pre-Employment Medical Agreement, as well as the numerous statements by his training officers and supervisors about his performance difficulties related to his hearing, it was obvious to Defendant that Officer Nguyen had a hearing disability—or at least a physical

---

[16] However, if this Court were to decide that *Robertson* is irreconcilable with *Koessel and Dinse,* an en banc decision of the 10th Circuit, *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999), on which *Robertson* relied, is instructive: "*In general*, the interactive process must *ordinarily* begin with the employee providing notice to the employer of the employee's disability and any resulting limitations." (Emphasis added.) By using the terms "[i]n general" and "ordinarily," *Smith* recognizes exceptions to the notice rule, and it does not preclude one such exception from being when the disability and need for reasonable accommodation are obvious.

impairment causing hearing problems—and that he needed a reasonable accommodation to perform the essential functions of his job. *See* RSUMF, ¶¶ 22, 27, 28, 30; SADMF, ¶¶ 4-5, 8-9, 12-13.

          ii.     **Officer Nguyen Requested an Accommodation**

However, even if an express request for an accommodation were a requirement to initiate the IAP, Officer Nguyen made such a request. Notice or request for an accommodation "does not have to be in writing . . . or formally invoke the magic words 'reasonable accommodation'"; it merely "must make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313. The Pre-Employment Medical Agreement Officer Nguyen signed "[made] clear that [he] want[ed] assistance for his . . . disability," *id.*, as it was an explicit acknowledgment that he was " being offered. . .  an accommodation for [his] medical condition of bi-lateral hearing loss . . . . to help ensure that [he was] able to perform the essential functions" of the job of DPD officer, SADMF, ¶ 5. A prerequisite to an offer of assistance and the acceptance of that offer is mutual recognition that the assistance is needed, which entails that both Defendant and Officer Nguyen recognized that as a condition to employment, Officer Nguyen would need and be provided assistance for his disability.

Once Officer Nguyen executed the Pre-Employment Medical Agreement, he did not need to make further effort to obtain assistance for his hearing disability because "the duty to provide reasonable accommodation is a continuing one . . . and not exhausted by one effort." *Ralph v. Lucent Techs.,* 135 F.3d 166, 172 (1st Cir. 1998).

> Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. . . . If a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue

hardship. ***Thus, the employer's obligation to engage in the [IAP] extends beyond the first attempt at accommodation and continues when . . . the employer is aware that the initial accommodation is failing and further accommodation is needed***.

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001) (citation omitted) (emphasis added). Because Officer Nguyen and Defendant had already agreed that he would be provided a reasonable accommodation, once it became clear he needed further accommodation to perform the essential functions of his job, Defendant was obligated to initiate the IAP.[17]

    And, even if the Pre-Employment Medical Agreement by itself were not enough to constitute notice by Officer Nguyen of his desire for assistance for his disability, a reasonable jury could believe that Officer Nguyen made at least three other requests for accommodation. First, in the Academy, Officer Nguyen asked one of Defendant's employees about obtaining a FreeLinc device. RSUMF, ¶ 7. The fact that he did so before recruits were given radios is irrelevant. The premise that "an employer need provide reasonable accommodation under the Act only *at the moment* such accommodation is needed" is flawed because "the term 'reasonable accommodation' means those accommodations which presently, or in the *near future*, enable the employee to perform the essential functions of his job." *Roberts v. Progressive Indep., Inc.*, 183 F.3d 1215, 1220 (10th Cir. 1999) (citation omitted). Otherwise, "an employer could escape liability for failure to provide reasonable accommodation by terminating employment before the exact moment accommodation is needed." *Id.* Second, according to Defendant, Officer Nguyen requested accommodation "when he asked Corporal Ford in Phase 1. . . if he could bring in an earpiece." **Ex. 19,** Def.'s Resp. to Pl's Disc., at 6. The fact that the earpiece obviously did not

---

[17] Defendant cannot avoid liability on this issue by contending that Officer Nguyen's supervisors were not actually aware of the Pre-Employment Medical Agreement due to the fact that a different department had executed the agreement with Officer Nguyen. If it could, any employer could avoid its ADA obligations by compartmentalizing its operations. Such manipulation should not be able to thwart the mandates of federal law.

address many of Officer Nguyen's hearing difficulties regarding the radio was enough to trigger

Defendant's duty to engage in the IAP to determine what accommodation *would* work. *See*

*Humphrey*, 239 F.3d at 1137-38. Likewise, Officer Nguyen testified that during the same

conversation in which the topic of the earpiece arose, he asked Officer Ford for suggestions to

help with his hearing issues, RSUMF, ¶ 13, thereby also triggering Defendant's IAP duty.

### iii.   Officer Nguyen's Conduct Did Not Excuse Defendant's Failure to Initiate the IAP

Finally, contrary to Defendant's argument, none of Officer Nguyen's after-the-fact

statements in his deposition about whether he could perform his job adequately without further

accommodation excuse Defendant's failure to timely initiate the IAP. *See* **Mot. Summ. J.** 15, 20.

An "individual's reject[ion] of a reasonable accommodation . . . that is necessary to enable the

individual to perform the essential functions of the position" when such an individual "cannot, as

a result, of that rejection, perform the essential functions of the position" means the individual is

not "considered [a] qualified" individual with a disability. 29 C.F.R. § 1630.9(d). However,

unlike the plaintiff in *Baker v. City & Cty. of Denver*, No. 14-cv-02468-REB-CBS, 2016 U.S.

Dist. LEXIS 504, at *16 (D. Colo. Jan. 5, 2016), who told her employer "she could perform her

job without any accommodation of her disabilities" in response to the employer's initiation of the

IAP, Officer Nguyen never rejected any accommodation that was offered to him by Defendant

that would have enabled him to perform the essential functions of his position, nor did he refuse

to participate in the IAP.

Rather, as in *Robertson*, 500 F.3d at 1194, Officer Nguyen's subjective beliefs about his

hearing ability, expressed during the course of litigation, are irrelevant. *See id.* (holding that the

district court erred in considering plaintiff's testimony that "his inability to hear does not

physically bother him and that he does not consider it either a physical or mental impairment" an

"admission" that he was not disabled because "the fact that [the plaintiff] . . . does not consider himself to be substantially limited by [his impairment] does not enter into the calculus").[18] And assuming Officer Nguyen really does or did believe that he was able to perform the essential functions of his DPD officer job, such a scenario "presents a[] strong[] case for mitigating [any] requirement that [he] seek accommodation." *Brady*, 531 F.3d at 135. Such a situation is almost tantamount to a case in which an employee's mental illness prevents the employee from requesting a reasonable accommodation: "[t]he employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

Likewise, Officer Nguyen's statements to his training officers that he did not know if anything could be done to accommodate his disability, *see* **Def.'s Mot. Summ. J.** 19, did not discharge Defendant's obligation to initiate the IAP once it became clear that his hearing impairment was preventing him from performing the essential functions of the job. Since "the purpose of the [IAP] is to determine the appropriate accommodations," it "would make little sense to insist that the employee must have arrived at the end product of the [IAP] before the employer has a duty to participate in [the] process." *Taylor*, 184 F.3d at 316. The fact that Officer Nguyen was not sure what could be done to help with his hearing issues on the job shows the necessity of the IAP. As does Defendant's argument that Defendant was excused from its

---

[18] *Cruz Carillo v. AMR Eagle, Inc.*, 148 F. Supp. 2d 142, 146 (D. P.R. 2001), cited by Defendant for the proposition that "[i]t is incongruous . . . to claim discrimination for lack of accommodation when there is no need for one," is distinguishable because in that case, the parties had stipulated the plaintiff was capable of performing the essential functions of his job.

IAP duty because it had already given Officer Nguyen an opportunity to try new hearing aids during FTO. *See* **Def.'s Mot. Summ. J. 23**.

As discussed above, the fact Officer Nguyen did not immediately get new hearing aids after his training officer suggested during FTO that he go see a doctor does not fall under the purview of 29 C.F.R. § 1630.9(d), given that Defendant never *offered* him anything, much less a reasonable accommodation; the offer of a reasonable accommodation is obviously a prerequisite to the rejection of it. *Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000), is thus distinguishable because in that case, the employer "*offered* the employee an accommodation in the form of a more sedentary job, which he refused." (Emphasis added.); *see also Hendrick v. W. Reserve Care Sys.*, 355 F.3d 444, 448 (6th Cir. 2004) (holding the plaintiff could not be considered a "qualified individual with a disability" because she rejected reassignment to another position that her employer had offered to her as a reasonable accommodation). Moreover, "an employer [is] not relieved of its obligation to provide reasonable accommodation for an employee with a disability who fails to . . . use an assistive device (such as a hearing aid)" because "[t]he ADA requires an employer to provide reasonable accommodation to remove workplace barriers, regardless of what effect . . . assistive devices may have on an employee's ability to perform the job." The U.S. Equal Employment Opportunity Comm'n, https://www.eeoc.gov/policy/docs/accommodation.html. It thus follows that Officer Nguyen's failure to immediately obtain new hearing aids in January 2014 after his training officer suggested he see a doctor about his hearing did not relieve Defendants of its duty to timely initiate the IAP.

Indeed, testimony regarding Officer Nguyen's January 2014 doctor appointment shows the peril of not initiating the IAP but instead relying entirely on Officer Nguyen's discussions

with his superior officers. While Officer Nguyen believed his training officer wanted him to discuss surgical options with his doctor, RSUMF, ¶ 24, it appears from Corporal Juarez's DOR that he intended that Officer Nguyen also discuss hearing aid options. Adding to the confusion, while Officer Nguyen told Corporal Juarez that his hearing aids were the "best fit" for his ear and condition, *id.* at ¶ 21, Officer Nguyen's statement got lost in translation and his other training officers and supervisors believed he said that he had the best hearing aids available, *see* **Ex. 9,** Quinones Dep. 58:13-24 ("[Officer Nguyen said] that his doctors have told him those are the best hearing aids he [could] get."); **Ex. 28,** Ford Dep. 86:9-21; **Ex. 6,** Heimbigner Dep. 91:15-23. Once Defendant actually complied with its ADA obligation and initiated the IAP, it then became clear to Officer Nguyen and Defendant that there were stronger hearing aids available. In part for this reason, on notice of an employee's disability and need for an accommodation, the ADA requires initiation of the IAP, not merely a game of telephone among the employee, his doctor, his immediate supervisors, and their supervisors. *See Smith*, 180 F.3d at 1172 ("The interactive process is typically an essential component of the process by which a reasonable accommodation can be determined.") Because Defendant had such notice before deciding to fire Officer Nguyen, there are genuine issues of material fact whether it violated the ADA in not initiating the IAP sooner. *Cf. id.,* at 1179 (reversing summary judgment where genuine disputes of fact existed as to plaintiff's invocation of, and defendant's response to, the interactive process).

### b. The Interactive Process and the Good Faith Requirement

The interactive process "identif[ies] the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). It requires the employer "to implement the accommodation that is most

appropriate for both the employee and the employer" by using a "flexible," "problem solving

approach" to "[a]nalyze the particular job involved and determine its purpose and essential

functions"; "[c]onsult with the [employee] to ascertain the precise job-related limitations

imposed by [his] disability and how those limitations could be overcome with a reasonable

accommodation"; and "[i]n consultation with the [employee], identify potential accommodations

and assess the effectiveness each would have in enabling [him] to perform the essential functions

of the position." 29 C.F.R. Part 1630 Appendix.

"[T]he interactive process is a mandatory, rather than a permissive, obligation on the part

of employers under the ADA"; it "is at the heart of the ADA's process and essential to

accomplishing its goals." *Barnett*, 228 F.3d at 1113-14; *see also Jacobsen*, 2012 U.S. Dist.

LEXIS 25019, at *29 (Babcock, J.) ("The obligation to engage in an interactive process is

inherent in the statutory obligation to offer a reasonable accommodation to an otherwise

qualified disabled employee." (citation omitted)); *United States v. Denver*, 49 F. Supp. at 1240-

41. For this reason, both parties must participate in the interactive process in good faith. *Smith*,

180 F.3d at 1172. An employee who contends that the employer did not meet its obligation to

initiate the IAP or did not participate in the IAP in good faith may establish the employer

violated the ADA by showing that "the employer's failure to engage in [the] IAP resulted in a

failure to identify an appropriate accommodation for the qualified individual." *Lowe v. Indep.

Sch. Dist. No. 1*, 363 F. App'x 548, 552 (10th Cir. 2010). "[B]ecause employers have a duty to

help the disabled employee devise accommodations, an employer who acts in bad faith in the

interactive process will be liable if the jury can reasonably conclude that the employee would

have been able to perform the job with accommodations," i.e., "the employee could have been

reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 317-18, 320;.

Making this showing establishes a violation of the ADA because, as discussed above, "not making reasonable accommodations to the known physical or mental limitations" of a disabled employee constitutes discrimination. 42 U.S.C. at § 12112(b)(5)(A). Moreover, "[f]ailure to consider the possibility of reasonable accommodation for [an employee's known disabilities], if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995).

Accordingly, "[a] question of fact as to whether an employer has failed to interact in good faith and thus failed to reasonably accommodate will preclude summary judgment for the employer." *Lowe*, 363 F. App'x at 552; *see also Smith* 180 F.3d at 1174 (concluding summary judgment is "premature if there is a genuine dispute regarding whether [the employer] participated in good faith in" the interactive process). A court will not "readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have had no effect" because doing so "would effectively eliminate the requirement that employers must participate in the interactive process." *Taylor*, 184 F.3d at 318; *see also Simmons v. UPS*, 310 F. App'x 973, 974 (9th Cir. 2009) ("Where there is a genuine dispute of material fact as to whether the employer properly engaged in the interactive process, summary judgment will seldom be appropriate because it is extremely difficult to prove that no reasonable accommodation would have been available.").

Defendant violated its obligation to participate in the IAP in good faith in at least three ways. The first two were discussed in previous sections and consisted of not reasonably

determining whether Officer Nguyen was disabled and not initiating the IAP when its obligation to do so was triggered. But Defendant also violated its good faith obligation by initiating the IAP *after* it decided to fire Officer Nguyen. *See* RSUMF, ¶¶ 37, 40-41; SADMF, ¶¶ 16-18. All three of these acts are related to the other two in that each act or failure to act by Defendant resulted in its firing Officer Nguyen without ever providing him a reasonable accommodation, yet now believing that it can legitimately argue that it "went above and beyond its duty by initiating . . . the formal [IAP]," which was so generous that "[t]he Court need not even consider [that] event[]" in its analysis. **Def.'s Mot. Summ. J.** 19-20.[19]

It does not follow that because Defendant had already decided to terminate Officer Nguyen when he went to speak with Ms. Iverson after learning he would not return to FTO, Defendant was not required to initiate the IAP or provide him a reasonable accommodation. *See id.* at 19. The cases Defendant cite address situations in which the "reasonable accommodation" sought by the plaintiff was a second chance to show that he or she could perform the position without any additional reasonable accommodation, or the accommodation sought was the excusal of past misconduct that the employer had determined was not caused by the plaintiff's disability. *See Dewitt v. SW. Bell Tel. Co.*, 845 F.3d 1299, 1305-06, 1309-10, 1316 (10th Cir. 2017); *Siefken v. Vill. Of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995). Officer Nguyen's claim is not that Defendant should have offered him as a reasonable accommodation "retroactive leniency—irrespective of whether the misconduct resulted from [his] disability."

---

[19] As an initial matter, Defendant provides no support for its assertion that essentially, because it initiated the IAP when it allegedly had no obligation to do so, it had no obligation to participate in good faith. The two cases it cites do not address the issue here; rather, they deal with whether an employer who has provided an accommodation it was not obligated to provide has to continue to provide that accommodation indefinitely. *See EEOC v. TriCore Reference Labs*., 493 F. App'x 955, 959-60 (10th Cir. 2012); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544-45 (7th Cir. 1995).

*Dewitt*, 845 F.3d at 1316. Rather, Officer Nguyen's claim is that because Defendant had notice, a significant amount of time before it decided to fire him, that he was disabled and needed reasonable accommodation, and Defendant's failure to provide reasonable accommodation caused most of the performance difficulties for which it contends it fired him, his termination was caused by Defendant's failure to reasonably accommodate him, in violation of the ADA. *See Borkowski*, 63 F.3d at 143; *see also United States v. Miss. Dep't of Pub. Safety*, 309 F. Supp. 2d 837, 842 (S.D. Miss. 2004); *Rednour v. Wayne Twp.*, 51 F. Supp. 3d 799, 820-21 (S.D. Ind. 2014).[20] The second chance doctrine applied in *Siefken* and *Dewitt* "den[ies] already accommodated and at-fault plaintiffs from winning an endless string of new accommodations after each failure. The doctrine does not apply to plaintiffs who, through no fault of their own, [had] not yet had a chance to get the [accommodations] they need." *Steere v. George Wash. Unv.*, 368 F. Supp. 2d 52, 57 (D. D.C. 2005).

Even were Defendant correct (which Officer Nguyen disputes) that its obligation to initiate the IAP was not triggered until Officer Nguyen's conversation with Ms. Iverson, because "the determination of whether an individual is a qualified individual with a disability must be made as of the time of the [adverse] employment decision," *Jacobsen*, 2012 U.S. Dist. ELXIS

---

[20] The cases cited by Defendant are also inapplicable because they rely on the principle that "[a]n employer never has to excuse a violation of a uniformly applied conduct rule that is job related and consistent with business necessity." *Dewitt*, 845 F.3d at 1316 (quoting The U.S. Equal Employment Opportunity Comm'n, *Enforcement Guidance on Reasonable Accommodations Undue Hardship Under the Americans with Disabilities Act* (Oct. 27, 2002), *available at* https://www.eeoc.gov/policy/docs/accommodation.html). Because other recruits were not terminated for very similar performance issues for which Defendant contends Officer Nguyen was fired, *see* § V.C, Defendant unlawfully selectively applied its conduct and/or performance standards to target Officer Nguyen because of his hearing disability. *See Spulak v. K-Mart Corp.* 894 F.2d 1150, 1155 (10th Cir. 1990) ("A plaintiff may counter proof of legitimate business reasons by showing that the rules were not uniformly enforced, thereby raising the inference that the employer selectively enforced its rules against the plaintiff and the rules were but a pretext to mask [unlawful] discrimination.").

25019, at *22 (Babcock, J.), the fact Officer Nguyen was not officially terminated until two months after the initiation of the IAP means Defendant was still obligated to comply with the ADA, which meant participating in the IAP in good faith. As explained by the District of Columbia District Court in an analogous situation in which the adverse action had been recommended but not yet acted on, Defendant's "own regulations doom its timeliness argument." *Steere*, 368 F. Supp. 2d at 57; *see also Singh v. George Wash. Univ. Sch. Of Med. & Health Scis.*, 408 F.3d 1097, 1105 (U.S. App. D.C. 2007) (plaintiff's request for reasonable accommodation after dismissal recommendation needed to be considered). Because the obligation to initiate the IAP was, according to Defendant, triggered when Officer Nguyen spoke with Ms. Iversen, which was before Executive O'Malley, "who had sole authority to terminate [Officer Nguyen's] employment," **Def.'s Mot. Summ. J. 9**, acted on the termination recommendation, Defendant's had a then-current obligation to provide Plaintiff a reasonable accommodation, and a concurrent obligation to participate in the IAP in good faith. *See Bultemeyer*, 100 P.3d at 1287 (concluding that the defendant did not act in good faith when "it was well aware of [the plaintiff's medical condition]," "fired [the plaintiff] as soon as it could" for failing to report to work, and "when he presented a request for reasonable accommodation, . . . ignored it, saying that it came too late.").[21]

---

[21] Moreover, if Defendant truly believed it had no obligation to allow Officer Nguyen to return to work with a reasonable accommodation because he had essentially already been fired, why even initiate the IAP at all? Several employees of Defendant, including Ms. Iversen, have tried to suggest that despite the obvious answer to this question—that the IAP was a sham intended to look like ADA compliance without actually complying—the IAP was not a sham (although, according to Ms. Iversen, such a scenario is "problematic") because one purpose of the IAP is to determine whether an employee who cannot perform the essential functions of the job of police officer could be reassigned to another position with Defendant. **Ex. 14**, Iversen Dep. 83:25-84:6, 90:14-20; *see also* **Ex. 15,** Klee Dep. 39:18-24. However, under DPD's ADA policy, "[t]he preferred option [in undertaking the IAP] always shall be a reasonable accommodation that allows the employee to remain in his/her existing job as a Denver Police Officer." **Ex. 12,** DPD

For a similar reason, Defendant purchasing or providing the hearing aids for Officer Nguyen is not the reasonable accommodation he is proposing. *See* **Def.'s Mot. Summ. J.** 22-23. Rather, the reasonable accommodation—which, again, is determined at the time of the adverse employment action—would have been granting Officer Nguyen the opportunity to obtain new hearing aids (and provide him the use of a FreeLinc) rather than terminating him because he could not perform the essential functions of his job. Such a scenario is contemplated by the rule that "[a]n allowance of time for medical care or treatment may constitute a reasonable accommodation." *Rascon v. U.S. W. Communs.*, 143 F.3d 1324, 1333-34 (10th Cir. 1998). If Officer Nguyen were an employee with a more visible disability, such as the need to use a wheelchair, but his wheelchair was not working properly during a probationary period at work thereby preventing him from performing the essential functions of his job, no reasonable jury would accept the argument that an employer could fire him rather than afford him time to fix his wheelchair or get a new one. *See* The U.S. Equal Employment Opportunity Comm'n, https://www.eeoc.gov/policy/docs/accommodation.html ("An employee with a disability may need leave for a number of reasons related to the disability, including, but not limited to: obtaining repairs on a wheelchair . . . .") .

Here, because a reasonable jury could conclude that Officer Nguyen was not provided a reasonable accommodation during FTO because of Defendant's failure to timely initiate or participate in the IAP, and he could have performed the essential functions of the job if he were,

---

Policy, at 3. Because Defendant had already decided Officer Nguyen would not return to DPD as a police officer, with or without a reasonable accommodation, it is clear Defendant did not intend to comply with its own policy. Additionally, the job description Defendant supposedly included as part of the RAQ packet was for a police officer, not any other position.

there are disputed factual issues whether Defendant denied Officer Nguyen a reasonable

accommodation and thus violated the ADA.

### C. DEFENDANT DISCRIMINATED AGAINST OFFICER NGUYEN BY TERMINATING HIM BECAUSE OF HIS HEARING DISABILITY.

In addition to the disputed factual issues shown above regarding whether Defendant

discriminated against Officer Nguyen by not providing him a reasonable accommodation, there

are also disputed factual issues whether Defendant discriminated against Officer Nguyen by

unlawfully discharging him due to his disability.

As to Officer Nguyen's burden on this prong, "unlike a person's race, an employer may

legitimately take a [disability] into consideration in determining whether . . . an employee is

qualified for a particular position." *Barth v. Gelb*, 2 F.3d 1180, 1185 (U.S. App. D.C. 1993).

When employers "acknowledge that they have taken a person's [disability] into consideration" in

making an employment decision, *McDonnell Douglas*-type burden shifting is not applicable.

Here, Defendant explicitly relied on Officer Nguyen's hearing disability in firing him, *see, e.g.*,

SADMF, ¶¶ 12-13, 15, on the (perhaps implicit) assumption that he was not a qualified

individual who could perform the essential functions of the job with a reasonable

accommodation. Because his disability explicitly motivated DPD to terminate his employment,

Officer Nguyen has established that his termination was based on his disability, and because, as

shown, above, Officer Nguyen has at least established a disputed issue of material fact that he

can, with a reasonable accommodation, perform the essential functions of the job of DPD police

officer, there are also disputed factual issues whether his termination violated the ADA. *See id.*;

*see also Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994) ("The causal relationship between

disability and decision need not be direct, in that causation may be established if the disability

caused conduct that, in turn, motivated the employer to discharge the employee.").

But if the direct evidence that Defendant relied on Officer Nguyen's disability in firing him is not sufficient to establish Defendant discriminated against him because of his disability, applying a traditional *McDonnell Douglas* pretext analysis shows that a reasonable jury could conclude Officer Nguyen's termination was based on his disability, and indeed, *solely* on his disability. An adverse employment decision is based solely an employee's disability "if the only reason" for the decision was the disability. *Sedor*, 42 F.3d at 746. While Defendant argues that issues like report writing and orientation also played a role in Officer Nguyen's termination, the End of Phase Reports for many of his classmates show that such an assertion is pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) ("A plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual.").

Many of Officer Nguyen's classmates made officer safety mistakes that were of comparable seriousness as those his training officers and supervisors said that he made, and some of the reported incidents involving his classmates were in fact very similar to allegedly inexcusable things that he had done. *See, e.g.*, SADMF, ¶ 28.b, e, g, h, i, j, k; *Cf. Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 541 (10th Cir. 2014) ("When comparing different treatment of similarly-situated employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." (citation omitted)). All these same classmates also had significant struggles with report writing, orientation, and/or radio listening and comprehending. *See, e.g.*, SADMF, ¶ 28.b, e, g, h, i, j, k. Yet, not only are all of them now (or at least as of the end of 2016) current DPD officers, they were all given at least one full remedial training phase immediately after their weaknesses were identified as needing

such training, and indeed some of these recruits were given two *or even three* remedial training phases. *See, e.g.*, SADMF, ¶ 27.b, e, g, h, i, j, k. The only significant difference between these officers and Officer Nguyen, however, appears to be his hearing disability. *See Garrett*, 305 F.3d at 1219-20 (holding that the plaintiff of a protected class raised a genuine doubt about the defendant's motivation in part because his performance was very similar to that of a co-worke who was not in the protected class who was treated more favorably).[22]

Additionally, Defendant has changed its justification for firing Officer Nguyen multiple times since he was fired and during the course of litigation, bouncing from he was not disabled to it was mostly report writing and orientation to he could not perform the essential functions of the position with or without an accommodation regardless. *See*, *e.g.*, SADMF, ¶¶ 14, 30. "An employer's change in justifications for its decisions supports a finding of pretext when . . . the change is made after significant legal proceedings have occurred." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005).

"So long as the plaintiff has presented evidence of pretext . . . upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury." *Plotke v. White*, 405 F.3d 1092, 1103 (10th Cir. 2005). Because there are at the very least disputed factual issues whether Defendant's reason for firing Officer Nguyen was his hearing disability, his ADA and Rehabilitation Act claims may not be summarily judged.

---

[22] The other recruits' reports also show why it was so easy for Defendant to assert a seemingly legitimate basis for firing Officer Nguyen. Unlike many jobs, in which an employee may have only an annual review, if that, and so only truly serious or consistent issues are addressed, FTO trainees were extensively evaluated in writing *every* day of FTO. Given that so many of his fellow, non-disabled, still-employed trainees also have long records showing their performance difficulties, it is not surprising that Defendant was able to show Officer Nguyen had issues besides just hearing.

## VI.    CONCLUSION

WHEREFORE, for the foregoing reasons, the multitude of remaining genuine issues of

material fact precludes this Court from summarily judging Officer Nguyen's claims, and Officer

Nguyen respectfully requests that Defendant City and County of Denver's Motion for Summary

Judgment be denied.

Respectfully submitted this 26th Day of June 2017.

KILLMER, LANE & NEWMAN, LLP

_s/ Liana Orshan_
David A. Lane
Liana Orshan
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
lorshan@kln-law.com
_Attorneys for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 26th day of June 2017, I filed a true and correct copy of the foregoing **RESPONSE TO DEFENDANT CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT** via CM/ECF which will generate notice to the following:

Kristin George
Kristen Merrick
Jessica Allen
Denver City Attorney's Office
201 W. Colfax Ave, Dept. 1108
Denver, CO 80202
720-913-3100
Kristen.merrick@denvergov.org
Kiristin.george@denvergov.org
Jessica.allen@denvergov.org
*Counsel for Defendant*

_s/ Liana Orshan_____
Liana Orshan